JAVIER GURROLA
672 Second Avenue
San Bruno, CA 94066
jvillanueva1020@gmail.com
Plaintiff In Pro Per



FILED

JUN 26 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
OAKLAND OFFICE

UNITED STATES DISTRICT COURT

FOR THE NORTHER DISTRICT OF CALIFORNIA

OAKLAND DIVISION

JAVIER GURROLA

   Plaintiff,

  vs.

APPLE INC., ET AL

   Defendant(s)

CASE NO.: CV-192389-JSW

SECOND AMENDED COMPLAINT

## JURISDICTION AND VENUE

1. This is an action for injunction relief and damages pursuant to 42 U.S.C. §1983 and 1985 based upon the continuing violations of the Plaintiff's rights under the Fourth, and Fourteenth Amendments to the United States Constitution. Jurisdiction exists pursuant to 28 U.S.C. §1341 based on 42 U.S.C. §1983 for violations under color of State law and §1343 based on 42 U.S.C. §1985 for the deprivation of constitutional rights or privileges of a citizen of the United States, by any act done in furtherance of a conspiracy and questions of federal constitutional law. Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. §2202 and under The Electronic Communications Privacy Act 18 U.S.C. §2510 et seq. and the Computer Fraud and Abuse Act 18 U.S.C. §1030. Supplemental Jurisdiction over Plaintiff's state law claims is pursuant to 28. U.S.C. §1367 to include Caci No. 1600-Intentional Infliction of Emotional Distress and Section 17200 et seq. violations based on conspiracy to violate 17200.

2. Venue is proper in the Northern District given that a considerable number of the events and conduct complained of herein occurred in the Northern District and a number of the Defendants reside in the Northern District.

PRELIMINARY STATEMENTS

3. "In 2019, it's time to stand up for the Rights to Privacy-Yours, mine, all of ours."[1] Plaintiff concurs with Tim Cook, CEO of Apple, Inc. The Plaintiff is fighting for everyone's rights to Privacy and other Constitutional Rights. And, the Plaintiff is pledging 75% of all monies awarded to him by the Court and from book sales and movie rights if that was to become to help the homeless and to a yet to be named foundation to help students pursuing a Registered Nursing degree.

4. The Plaintiff's American Nightmare to include the planning, execution and aftermath of the burning of his property was made possible by technological vulnerabilities of MacOS and iOS to include GPS location coordinates provided by Google's tracking software embedded in Apple products, and Real Time satellite imaging made possible by ESRI's computer peripherals and bespoke software, coupled with ESRI's employee Burgess, who utilized his hacking skills and knowledge of vulnerabilities in a MacBook Pro, and a number of iPhones owned by Plaintiff from 2013 to 2019. Burgess' access to ESRI's satellites, drones, computer peripherals and bespoke software opened a window of opportunity for Burgess, in conspiracy with MVPD's Sergeant Swan, other Defendants in Law Enforcement, Fire Captain David LaClair and the Plaintiff's neighbors, to destroy the Plaintiff's life.

5. The Plaintiff closed the purchase of 23833 Whittier Street, Colton, CA ("The Property") without knowledge of the number of easements and encumbrances against The Property, as he was not presented with the Preliminary Title Report.

6. One morning in the summer of 2008, a Moreno Valley Police Officer drove to the gate of The Property on a loud music call. The Plaintiff apologized and explained that Roelle, in company of her son Colt Musee, had threatened to send her friends from The Hells Angels to "take care" of The Plaintiff. Roelle had come to The Property and yelled, "Turn off your fucking Mexican music." The Plaintiff replied, "I know my Constitutional

---

[1] Time, January 28, 2019. P. 29.

2

rights. Get used to it." The officer did nothing about the death threat. Had it been The Plaintiff threatening to send The Mexican Maffia to take care of Roelle, MVPD, the Riverside County Sheriff's Department, SWAT, ATF and FBI would have knocked the door down. Having faced no consequences for her threat, Roelle and her sons, Rojas, Martinez and Chase T. Miller became bolder in their actions and unlawful behavior.

7.      On or around October 20, 2009, two MVPD officers drove to The Property on a call for gun shots fired by either Roelle or Rojas, who also owned and fired guns. The officers set their gazes on Ochoa's hour-glass figure, fixing their eyes on her derriere. The Plaintiff called their attention. The officers left The Property more upset than embarrassed. Less than two months later, Roelle, Rojas and Martinez stole one of the Plaintiff's mares. And, soon after, a brush fire was ignited by Cody Musee. Omar Lopez, the Plaintiff's tenant, notified the Plaintiff that Roelle, Rojas and Martinez were gathering signatures to kick him out of his property as they blamed him for the fire.

8.      On or around Thanksgiving Day 2010, two MVPD officers drove to The Property asking for Javier Morano. The Plaintiff, truthfully, informed the officers that he did not know anyone by that name. The officers asked if they could go into The Property and check things out. The Plaintiff replied, "Of course you can, provided you first show me a search warrant." The officers didn't have a search warrant. The Plaintiff was defending his 4th Amendment Constitutional rights against an illegal search.

9.      At the end of July 2011, The Plaintiff returned from Chicago to find his New Holland tractor about 50 yards from where he left it and with a seized engine. The Plaintiff called MVPD and requested an officer be sent to The Property. MVPD retaliated against The Plaintiff's unwillingness to allow the officers into The Property without a search warrant in November 2010 and replied, "We are not going to go." Two weeks later, someone broke into The Property, and in doing so, destroyed two doors. The Plaintiff called MVPD to hear the same reply, "We are not going to go." The Plaintiff rented the front and middle sections of The Property to Celso Ramirez and moved to 552 Third Avenue, San Bruno.

10.     On September 23, 2011, The Plaintiff disclosed to Celso Ramirez the 60' easement that was lost when the house was built leaving the three lots totaling 112

acres behind The Property with a 12' easement, good for one house. In order to develop the 112 acres, a 60' easement would have to be created. The Property is key.

11.     On October 1, 2012, The Plaintiff returned to The Property with a beautiful pair of Black German Shepherds, Johnny Cash and Shakira. Celso Ramirez left The Property. Two weeks later, Roelle loaded Johnny Cash on her truck and drove to Moreno Valley where she abandoned the dog. The Plaintiff returned from Ochoa's house to find Marko Uljik, the owner of the 112 acres, visiting Roelle. The first thing that came to the Plaintiff's mind was that Roelle was going to burn the house to re-establish the 60' easement. The Plaintiff began to procure nopal cactus leaves with the idea of creating a fire buffer to protect the house and began to plant hundreds of cacti. Chase T. Miller and wife Mandy came to The Property demanding for the Plaintiff to stop planting cacti. Later, Chase Miller, and Cody and Colt Musee threatened the Plaintiff with violence if he didn't stop planting cacti.

12.     On February 13, 2013, The Plaintiff and tenant Craig Short were talking about Christopher Dorner within the protective walls of the structure in The Property. The Plaintiff spoke sympathetic words about Dorner. Letters appeared on his cellular phone that implied The Plaintiff was wrong. That was the first hack on a Samsung phone under a T-Mobile cellular plan.

13.     On 2/28/13, MVPD Deputy Gurganious, jumped the front gate of The Property in a blatant disregard for the Plaintiff's Constitutional Rights, as he did not have a search warrant. Roelle had called MVPD for loud music. Gurganious asked why the Plaintiff was planting so many cacti. The music was not loud just, as it had not been loud on Roelle's first loud music call on 2/12/13, responded by Officer Puente whom turned back at The Property gate. Gurganious should have turned around at the gate. However, Gurganious had a hidden agenda and ended his visit with "If I have to come back here, I am going to be a real hard ass." The Plaintiff asked, "Officer, have I been disrespectful in any way, shape or form?" Gurganious answered "No." And, walked out of the Property. The Plaintiff drove to MVPD and reported Gurganious antics.

14.     On 3/17/13, Swan drove up to The Property and harassed, threatened, intimidated and discriminated against the Plaintiff on the fourth loud music call made by Roelle. The Plaintiff refused to yield to Swan's demands for an apology and a promise to

stop listening to Mexican music. Plaintiff invited Swan to walk into The Property for her to see that it was too small a boombox to be capable of playing loud music. Swan refused. Plaintiff asked Swan about the decibel level allowed. Swan didn't know. She then threatened to arrest Plaintiff who replied, "Go ahead. I am willing to stand in front of a judge and I am going to win." Swan then said, "You will have an arrest record." Plaintiff replied, "Only if I lose, officer. And, I am not going to lose. If anyone should be arrested, it should be the Musees and Chase Miller. They threatened me with violence if I didn't stop planting cacti." Swan replied, "That is in the past, you can't use it against them now." Swan then talked to Plaintiff's tenant, Craig Short in private. The following day, Plaintiff drove to MVPD and reported Swan. MVPD offered to put together a mediation team to deal between Plaintiff and Roelle. Plaintiff returned to The Property to find Craig Short about to leave The Property for good. Swan not only denied the Plaintiff's Constitutional rights, but also denied Plaintiff his right to rental income.

15.    On 3/21/13, Land surveyor Dan Gomez surveyed and marked the property line separating The Property and Roelle's Property. Within minutes, the markers disappeared. Plaintiff drove to MVPD and reported the theft of markers left by Mr. Gomez to MVPD clerk whom replied, "You can buy those markers at Home Depot for $2.95 a dozen." The Plaintiff mentioned the cost of the surveyor bringing the value of markers to $502.95. The MVPD clerk replied, "We are not going to go."

16.    On or about 8/2/13, The Riverside County Sheriff stated it could take a year or more for mediation to take place. The Plaintiff rented the Property and moved to Manteca, CA on 8/8/13.

17.    On August 28, 2013, The Plaintiff took a Marlin rifle to MVPD and asked them to destroy it. He then notified MVPD of two handguns registered to him, but out of his domain and asked them to retrieve them and destroy them. MVPD refused to do so. When the Plaintiff asked "what if someone was hurt or worse, killed by any of the two guns?" MVPD answered, "we will cross that bridge when we get there."

18.    On 1/10/14, Plaintiff evicted Justin Coughlin for having over 600 marihuana plants and for giving a $1,500 window to Roelle. He then drove to MVPD to report the 600 marihuana plants. MVPD replied with, "marihuana falls in a gray area and would mean a lot of paperwork and nothing to gain. And, for that, we not going to go." An

officer was sent to retrieve a $1,500 window from Roelle. The officer joked with Justin Coughlin and told the Plaintiff that he couldn't kick Blake Arce for he had no place to go.

19.    On 1/28/14, Plaintiff closed a 3-hour meeting with MVPD Chief of Police Ontiveros with, "If you don't do something about my neighbors and some of your officers' antics, something huge is going to happen." MVPD did nothing and in doing nothing, MVPD denied The Plaintiff Equal Protection of the Law, a protection guaranteed by The Fourteenth Amendment of the US Constitution pursuant to the 42 U.S.C. §1983. The Plaintiff received unequal treatment and alleges that he has been intentionally treated differently without a rational basis for the difference in treatment. The Plaintiff is an unpublished writer, not a criminal. Swan then conspired with other law enforcement officers in the Inland Empire and San Francisco Bay Area, California Highway Patrol and Fire Captain LaClair to destroy the Plaintiff's life, violating the 42 U.S.C. §1985 against conspiracies to injure or to deprive a citizen of his constitutional rights. Burgess violated The Electronic Communications Privacy Act 18 U.S.C. §2510 et seq. and the Computer Fraud and Abuse Act 18 U.S.C. §1030.

## THE PARTIES

20.    Plaintiff Javier Gurrola, a homeless man living in San Mateo County, is the sole Plaintiff in this lawsuit. He is the owner of an Apple MacBook Pro he purchased new in 2013 and the owner/user of an Apple iPhone 5 from 2013 to 2015 under the service of Ochoa's AT&T plan. Subsequently, Plaintiff owned a number of iPhones from 2016 to 2019 under the service of T-Mobile.

21.    Defendant Apple, Inc. ("Apple") is a California Corporation with its principal place of business located at 1 Infinite Loop, Cupertino, California, 95014.

22.    Defendant Google, Inc. ("Google") is a California Corporation with its principal place of business in Mountain View, California, 94043.

23.    Defendant Intel, Inc. ("Intel") is an American Multinational Corporation and technology company with its Headquarters located in Santa Clara, California, 95054.

24.    Defendant Facebook, Inc. ("Facebook") is an American social media Corporation with its Headquarters located in Menlo Park, California, 94025.

25.    Defendant T-Mobile US, Inc. ("T-Mobile") is a United States-based wireless network operator. Its headquarters are located in Bellevue, Washington, 98006.

26.     Defendant Environmental Systems Research Institute. ("ESRI") is a California private entity owned by Jack Dangermond and wife Laura, an international supplier of geographic information system (GIS) software, web GIS and geodatabase management applications offering real time satellite imaging with its Headquarters located in Redlands, CA 92373.

27.     Defendant National Railroad Passenger Corporation. ("Amtrak") is an American Company with its Principal Place of Business at 60 Massachusetts Avenue, NE, Washington, DC, 20002.

28.     Defendant Farmers Insurance Group ("Farmers") is an American Insurer whose parent company is Zurich Insurance Group and with its Headquarters located at 6303 Owensmouth Avenue Woodland Hills, CA 91367.

29.     Defendant U.S. Bancorp, is an American Bank Holding Company, parent of US Bank National Association ("US Bank"), the seventh largest bank in the United States with its Headquarters located in Minneapolis, Minnesota, 55402.

30.     Defendant Citigroup, Inc. ("Citibank") is an American Multinational Investment Bank, parent of Citibank N.A. with its Headquartered in New York City, NY.

31.     Defendant Nationstar Mortgage, LLC DBA Mr. Cooper. ("Nationstar") is a Texas LLC Corporation with its Headquarters located at 8950 Cypress Waters Blvd. Coppell, TX 75019.

32.     Defendant First American Title Insurance Company, ("First American") is a California company with its Headquarters located in Santa Ana, California, 92702.

33.     Defendant Assurant, Inc. is an American Insurance Company with Headquarters located in New York, NY, 11201.

34.     Defendant Arrowhead Regional Medical Center. ("Arrowhead") is a teaching hospital located at 400 N. Pepper Street, Colton, CA 92324.

35.     Defendant Eulalio Diaz Insurance Agency. Agent who sold the Insurance Policy located at 11600 Washington Pl Suite 112, Los Angeles, CA 90066.

36.     Defendant Miles & Westbrook. Litigation attorneys specializing in insurance bad faith, insurance policy claims, homeowner's insurance claims, construction defects, business transactions, located at 2255 Morello Ave #240, Pleasant Hill, CA 94523.

37.     Defendant Great American Insurance Company ("Great American"), issued the Statewide Claim Advisors Insurance Bond Number PJ-FS2874886 with its principal place of business located at 750 The City Drive S. Orange, CA 92868

38.     Defendant TLC Contents Restorations, Inc. ("TLC") is a California Corporation dealing with restoration services and general contracting, owned by Ruben Lopez with its principal place of business located 8690 Red Oak St., Rancho Cucamonga, CA 91730.

39.     Defendant Christina Hernandez, Realtor ("Hernandez") is a Real Estate Agent currently working for Century 21 Allstars, located at 9155 Telegraph Road, Pico Rivera, CA  90660. Realtor in the Buying side of The Property transaction in 2008.

40.     Defendant Sung Kim III, The Plaintiff's Tenant from March 2014 to January 5, 2015. His last known address was in Colton, CA.  bikelot@gmail.com

41.     Defendant Cheryl Roelle ("Roelle"). Resides at 23800 Whittier Street, Colton, CA, 92324. Plaintiff's neighbor.

42.     Defendant Colt Musee. Resides at 23800 Whittier Street, Colton, CA, 92324. Plaintiff's neighbor and son of Roelle.

43.     Defendant Cody Musee. Resides at 23800 Whittier Street, Colton, CA, 92324. Plaintiff's neighbor and son of Roelle.

44.     Defendant Patricio Rojas("Rojas"). Resides at 23786 Whittier Street, Colton, CA, 92324. Plaintiff's neighbor.

45.     Defendant Javier Martinez ("Martinez"). Resides at 22775 Whittier Street, Colton, CA, 92324. Plaintiff's neighbor.

46.     Defendant Chase T. Miller.  Resides at 23803 Whittier Street, Colton, CA, 92324. Plaintiff's neighbor.

47.     Defendant Paul A. Burgess. ("Burgess"). Works at 380 New York Street, Redlands, CA, 92373. The hacker.

48.     Defendant Shawn Gurganious.("Gurganious"), formerly of Moreno Valley Police Department, Currently a Police officer with Murrieta Police Department, 2 Town Square, Murrieta, California, 92562.

49.     Defendant Brandi Swan, ("Swan") Sergeant at Moreno Valley Police Department 22850 Calle San Juan de los Lagos, Moreno Valley, California, 92553.

50. Defendant David LaClair. ("LaClair") Fire Captain Specialist with Riverside County Fire Department, 210 W. San Jacinto, Perris, California, 92570.

51. Defendant Kyle Alexander ("Alexander"). Sergeant Redlands Police Department. 1150 Brookside Avenue, Redlands, California 92373.

52. Defendant Jose M. Villa ("Villa") Currently being held at L. A. County Jail serving a 7 and 10-year sentences. (His participation in the Conspiracy started after the 8/30/15 burning of The Property). Owner of Statewide Claims Advisors, the Public Adjuster in Plaintiff's Insurance Claim.

53. Kevin McDonald ("McDonald"). Farmers Employee at Headquarters located at 6303 Owensmouth Avenue Woodland Hills, CA 91367.

54. Brent Shipley ("Shipley"). Farmers Employee Headquarters located at 6303 Owensmouth Avenue Woodland Hills, CA 91367.

55. Defendant Jesus Gurrola. Resides at 552 Third Avenue, San Bruno, CA, 94066.

56. Defendant Rosalina Gurrola. Resides at 552 Third Avenue, San Bruno, CA, 94066.

57. Defendant Melisa G. Rios. Resides at 5313 Birdie Court, Richmond, CA 94806.

58. Defendant Elizabeth Gonzalez ("Gonzalez"), Resides at 2325 W. Lambert Lane, Oro Valley, AZ 85737. (at the time of the burning of Plaintiff's house, Gonzalez was splitting her time between Oro Valley, AZ and a property co-owned with husband Salvador Gonzalez in Adelanto, CA).

59. Defendant Rocio Ochoa, R.N. ("Ochoa") Resides at 22335 Figueroa Street, Apt. #5 Carson, CA 90745.

60. Defendant Maria J. Gurrola. Resides at 552 Third Avenue San Bruno, CA 94066.

61. Defendant Perla R. Rios. Resides at 5313 Birdie Court, Richmond, CA 94086.

62. Defendant Omar Hernandez. Resides at 5313 Birdie Court, Richmond, CA 94086.

63. Defendant Raquel Rios. Resides at 5313 Birdie Court, Richmond, CA 94086.

64. Defendant Silvia Barraza ("Barraza"). Resides at 407 Piccadilly Place #11, San Bruno, CA 94066.

65. Defendant Raquel Gurrola. Resides at 807 Jahns Court, Manteca, CA 95337.

66. Defendant Isabel Diaz. Resides in San Bruno, CA. Works at Kaiser Permanente, located at 1200 El Camino Real, South San Francisco, CA 94080.

67. Los Alamitos Race Track, ("Los Alamitos") is a Quarter horse and Thoroughbred Racing Track located at 4961 Katella Avenue, Cypress, CA.

68. Peter Miller Racing Stable, "(Peter Miller") is a Thoroughbred horse training outfit racing at Los Alamitos Race Track, Santa Anita Race Track and Del Mar Race Track, residing in Bonsall, CA.

69. Hector Palma, a Thoroughbred horse trainer and breeder racing at Santa Anita Race Track, Arcadia, CA.

70. Zone 4 Power. ("Zone") is a General Contractor owned by Ron Barker with its place of business at 338 Canal Street #10, South San Francisco, CA 94080.

71. Pinery Christmas Trees, ("Pinery") is a partnership operating Pumpkin Patches and Christmas Trees sales in six locations in the San Diego Area with its primary place of business located at 13421 Highland Valley Rd, San Diego, CA 92128.

72. Each of the Defendants, their employees and agents, participated personally in the lawful conduct challenged herein and, to the extent that they did not personally participate, authorized, acquiesced, set in motion, or otherwise failed to take the necessary steps to prevent the acts that resulted in the unlawful conduct and the harm suffered by the Plaintiff. Each acted in concert with each other in the challenged acts caused by the violation of the Plaintiff's rights.

73. Plaintiff ignores the true names or capacities of the defendants sued herein as, DOES 1 through 100. Each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and Plaintiff's damages, as herein alleged were proximately caused by those defendants. Once the identities of additional presently unknown co-conspirators are ascertained, Plaintiffs will seek leave of court to add them as named defendants herein.

FACTUAL ALLEGATIONS

A. The Technological Vulnerabilities and Events

74. In the summer of 2013, the Plaintiff purchased a new MacBook Pro, which was hailed as Unfixable, Untainable and Unhackable. Apple capitalized on the reputation its MacBook Pros enjoyed and charged a hefty premium vis-à-vis a similar computer from

the competition. In the fall of 2013, the Plaintiff purchased a new iPhone 5, which was under Ochoa's AT&T plan. The Plaintiff chose the iPhone 5 on the premise that it was unhackable, for he had already experienced the hack in February 2013.

75. On October 9, 2014, Apple iCloud's was hacked as reported by Novastor. The Cloud proved that the information stored in Apple's iOS products are not as secure as we thought. The leading theory is that the vulnerability was due to "Find My iPhone" app service to help users locate lost or stolen iPhones, laptops and iPads. Typically there are security measures in place to lock users out when a password is entered incorrectly after three to five attempts to prevent so-called brute force attempts to gain access to users' password data. The flaw in the "Find My iPhone" service resulted from NOT having any type of lockout system in place. This vulnerability gave hackers a means to make an unlimited number of password guesses.

76. On November 10, 2014, Reuters reported that a bug in Apple's iOS operating system makes most iPhones and iPads vulnerable to cyberattacks by hackers seeking sensitive data and control of the devices. Mac OS X and Mac iOS went from being considered Unhackable to be the most vulnerable to hacking.

77. On January 2, 2018, Apple, one of the world's largest manufacturers of mobile telephone and table devices, reported that the design flaw of its iOS processors, which are used in all iPhones, iPads and laptops, exposes the processor's kernel vulnerability. Apple's admission came after academics and researchers from Alphabet's Google Project Zero revealed and detailed two security flaws in computer chips dating back to 1995. A kernel is the most vital software component of a computer, which serves as a go between among programs and computer components, such as the processor and the memory. One of the kernel's main tasks is to prevent data in one program from being read by another when it should not. The Meltdown and Spectre allow hackers to abuse speculative execution to access privileged memory-including that of the kernel- from a less privileged user process on the device.

78. On 6/13/18, Apple announced blocking a loophole that allows the police to hack iPhones that have been blocked.

79. On 10/31/2018, yet another bug was found in iOS and MacOS. This new bug allows hackers to remotely crash all unpatched MacOS and iOS devices on the same

network, such as public Wi-Fi, thanks to a buffer overflow in the code that handles Internet Control Message Protocol (ICMP) packets.

80.     On January 29, 2019, news broke that a bug in FaceTime allows callers to listen to the audio of the person they are calling before that person picks up.

81.     Google technology, embedded on millions of smartphones, including Apple iPhones, store individuals' location information even if users activate a privacy setting purporting to prevent Google from doing so.

82.     Apple has been selling and distributing millions of iDevices with the defective Apple Processors, using Intel and AMD computer chips for ten years or more. Apple's 2019 Cash reserves are over $250 billion. It had $88.3 billion in revenues for the first quarter of 2018, resulting in $20 billion in profit. Apple designs its Processors which it manufactured or had manufactured by third parties, per its designs. Most of the vulnerabilities of Apple iOS products and Mac computers have been found by third parties, some by accident. The consensus of the industry is that Apple has been cheap when it comes to spending money in finding the bugs that makes its products vulnerable to hacking. Apple cannot justify not spending money to find the bugs to a lack of money.

83.     Each Apple iPhone is encoded with an electronically readable Unique Device Identifier ("UDID"). The UDID cannot be blocked, altered, or deleted. And, it has being used to track The Plaintiff's location and whereabouts. The traceability of the Macbook Pro is supposed to be a great thing in case it becomes lost or stolen. In addition, one can use the ability to track the device to remotely lock or erase it. Unfortunately, a hacker can also use the iPhone and MacBook Pro to track the user/owner, as well as remotely lock or erase it. Plaintiff did not give consent to anyone to use his iPhone as a tracking device nor to erase its files, which took years to create. Plaintiff did not set the MacBook Pro to be tracked or disabled. Furthermore, The Plaintiff was not aware that he could be tracked through his cellphone or Mac.

84.     Apple's Six Core Values include: Accessibility, Education, and Privacy, which according to Apple's CEO Tim Cook, are human rights. Mr. Cook believes that consumers should not have to tolerate another year of company irresponsibly amassing huge user profiles, data breaches that are out of control and the vanishing ability to control our own digital lives. Mr. Cook claims that the problem is solvable-not too big, too

challenging or too late. Innovation, breakthrough ideas and great features can go hand in hand with user privacy, and they must. Apple, with so much cash in its coffers, is in a position to invest in designing and manufacturing products that would be absolutely, positively secure against any and all hackers. We, the consumers, have a right to privacy and we all deserve control over our digital lives.

85. On June 2019, Apple's CEO Tim Cook's keynote in his speech at Stanford University's 2019 commencement is "If you want to take credit, first learn to take responsibility." He also stated, "We see it every day now, with every data breach, every privacy violation, every blind eye turned to hate speech. Fake news poisoning our national conversations." Tim Cook can have a huge and positive impact on our lives as the leader of Apple by making Apple's products infallible to hacking." Failure to do so may result in the United States adopting as intrusive policing policies as Xinjiang in China. Americans do not want to be surveilled by Robots. We deserve our Privacy.

## B. The Perpetrators Motivated Events

86. On or around 2/14/2014, Officer Garcia and another officer from MVPD came to The Property to talk to the Plaintiff. Garcia agreed that the theft of the mare should have been investigated. He also agreed with the Plaintiff that MVPD should have sent someone about the 600 plants of marihuana and he agreed that Roelle's taking of the window was unlawful conversion. However, MVPD did nothing. That same day, Blake Arce left a rag near the stove and went for a walk. The rag caught on fire seconds before the Plaintiff walked into the kitchen and threw into the sink. Blake Arce then took the Plaintiff to a 20-acre property that had been burned by the owner. The Plaintiff ignores Blake Arce's motivation for those two acts.

87. The Plaintiff and Javier Martinez went hiking a few times. The Plaintiff told Javier Martinez that he knew who was responsible for the theft of the mare and that he knew that Roelle had disappeared Johnny Cash. The Plaintiff said, "In regards to Patricio and Cheryl, who knows, maybe one day, I will get up on the wrong side of the bed."

88. Blake Arce introduced the Plaintiff to Sean Bradley, whom, according to Olivia Aguilar, was on house arrest for a sex offense involving a minor. Yet, Bradley visited The Property a few times. In one of those times, Bradley stated that he was interested in the property, but not the structure. The Plaintiff said, "The structure comes

with The Property." Then Bradley insinuated that he had friends in Florida who could fly over and burn it. The Plaintiff told Bradley that he didn't want to do anything illegal and for Bradley to buy the 20 acre burned property and to stay away. The Plaintiff kicked Blake Arce and upon leaving, Blake Arce contacted Edison and told them that the 600 marihuana plant operation was the Plaintiff's. Edison changed a close to $10,000 electricity bill from Blake Arce to the Plaintiff. The Plaintiff rented the Property to Sung Kim III and moved to 552 Third Avenue San Bruno to help take care of Maria J. Gurrola.

89.     On or around 11/23/14, the Plaintiff got a phone call from Olivia Aguilar alerting him that her boyfriend Sung Kim III and Roelle were conspiring to burn The Property, as they aimed to end up with it." The Plaintiff called Luis Gonzalez, an acquaintance, and asked if he knew anyone who could burn a house. Luis returned the call and said he knew of someone. The Plaintiff told Luis that he wanted to meet with him and the person. On November 29, The Plaintiff drove to The Property and told Sung Kim III to move out by the end of December 2014. The Plaintiff also met with Luis and Milton, a man from El Salvador and another man by the name of Aaron. The four man drove to the burned property on 20 acres the other side of the Reche Canyon Creek. According to Milton, most residential fires were caused by an electrical short. Milton asked, "But, why burn it, why don't you rent it to me?" The Plaintiff replied, "I don't want my property burnt, I want to protect it. But, yeah, I would rent it to you." The Plaintiff called nephew Eduardo Barraza and asked, "Lalo, do you know anyone who could burn a house? If so, I want to know the logistics. The house is in an area known as Reche Canyon in Riverside County."

90.     Sung Kim III moved out of The Property on 1/5/15.

91.     The Plaintiff placed an ad on Craigslist advertising Rooms for Rent for Single Mothers and drove to The Property. Plaintiff took with him a 30" statuette of La Santa Muerte, also known as the Skeleton Holy Saint of Death or Narco Saint, on advice of Melisa G. Rios, to keep the neighbors away.

92.     The Plaintiff found 90% of the cacti either dead or flattened with a tractor. Also, the rear unit bathroom completely gutted with two exposed wires touching. And, the electrical breakers that powered the rear unit had been removed. Plaintiff didn't even bother to contact MVPD. He knew the answer would be "we are not going to go."

93.     The Plaintiff believes Chase T. Miller procured Burgess. The group comprised of neighbors Roelle, her sons Colt Musee and Cody Musee, Chase T. Miller, Rojas, and Martinez, were bothersome with their unlawful behavior. The Neighbors plus Swan and Gurganious became troublesome. With Burgess added to the mix, the result was perilous. It is possible that Burgess is also responsible for the February 13, 2013 hack. Maybe he had been hacking the Plaintiff since or prior.

94.     End of January 2015, Colt and Cody Musee approached the Plaintiff and asked if he was selling. The Plaintiff established $395,000 as the sale price. Roelle and sons showed up the next day. Roelle stated, "$395 is a reasonable price, but would you finance?" The Plaintiff replied, "Only if the terms are favorable." Roelle asked, "How much do you owe?" The Plaintiff replied, "Oh, I don't know. $235. $240, maybe." Roelle then said, "We have an aunt that would make that amount available. We would then make payments to her and to you." The Plaintiff said, "that is not how things work. I have a background in finance and hold a Real Estate license. You miss a few payments and your aunt takes over the property and I am left with nothing." Roelle then said, "We are interested in the property, not so much the structure." The Plaintiff asked, "Are you guys planning to burn the property? Let me tell you, I neither condone nor encourage that behavior. You burn it, you will go to jail. Arson is the third highest punishable crime in the land. And, there is no statute of limitations." Cody Musee then spoke, "Burn it? No. I already did the fire behind your stables. But if something like that happened, would the insurance pay?" The Plaintiff shocked, replied, "Yeah, the insurance would pay, as long as I am not involved or any of my family members." Roelle and sons asked a number of questions to include, "Do you still have the guns? How do you keep up with the payments without working?, The Plaintiff answered, "I got rid of the guns. I don't need a gun to kill someone. And, I still have a cushion. I have a $29,000 credit line with Citibank and I am holding to family money. I am not going to give it away."

95.     The Plaintiff asked one question: "What are you going to do with The Property? You can't burn the front part of the house. It has 18" walls made of cinder block. Will you build a second story? Or, are you going to sell the 60 foot easement to Marko?" Neither mother nor sons answered.

96.     The following day, Colt and Cody Musee walked to The Property. Cody said, "Mom thinks $395 is too high." But, he didn't make a counter offer. Instead, Colt asked, "Your brother, how come he hasn't been around?" The Plaintiff explained that his brother had helped himself to close to $2,000 dollars from the Plaintiff's wallet and that they didn't talk.

97.     On or around 2/15/15, after MVPD did nothing about the stalking and hacking, the Plaintiff called nephew Eduardo Barraza and told him what was going on. Eduardo Barraza said, "My buddies are ready." The Plaintiff replied, "I don't want to burn my house." All they had talked about was logistics, which is part of research. For there to be solicitation, there has to be intent and an inquiry as to how much the act would cost and/or an offer for the act to be done. The Plaintiff drove back to 552 Third Ave in San Bruno and fearing for his life, added niece Perla R. Rios to his bank accounts at Chase and Citibank and gave her instructions as to how to proceed with the monies, as well as with his funeral arrangements.

98.     Burgess, through his incessant hacking and use of real time satellite imaging, facilitated the connection between the Plaintiff's neighbors and siblings. The Plaintiff believes that Swan conspired with Officer Brandenburg of the San Bruno Police Department ("SBPD") and had him coerce Jesus Gurrola into conspiring against Plaintiff or go to jail. Jesus Gurrola then involved sisters Melisa G. Rios and Rosalina Gurrola. Melisa G. Rios began to drug the Plaintiff with opiates without his knowledge or consent.

99.     On or around 3/10/15, Plaintiff talked to Jim Allan, the San Bruno Fire Marshall at the time as to what sort of thing could ignite and cause a house to burn.

100.     On 3/12/15, Plaintiff drove to The Property, which remained without power, and removed substances to include liquids, sprays, steel wool, paint stains and anything else that could ignite. That same day, someone drilled a whole on the radiator of the Plaintiff's BMW 740iL. Roelle told the Plaintiff, "How I wish a meteorite would fall on your house." The Plaintiff asked, "And, how would that benefit you?" She then said, "Your roof, it is so moldy." And, continued with "Are you going to write a book about us?" The Plaintiff replied, "Only if I decide to go on a massive shooting spree." And, finally, Roelle asked, "Are you feeling some strange juju?" Roelle was asking, not about the effects of witchcraft, but the effects of opiates Melisa G. Rios had been Administering to Plaintiff

without his knowledge or consent. The Fire Dept. drove to The Property and told Plaintiff to clear the dead grass, which is required in mid-Summer. That just didn't make sense as the area was covered with green. Nonetheless, Plaintiff did as told. He then told Martinez, "Cheryl is going to burn my house and blame it on me."

101.    Melisa G. Rios, began to talk about burning The Property. "If it wasn't for my arm surgery, I, myself, would drive to your property and burn it myself." Plaintiff asked, "And, why would you do such a thing?" Melisa G. Rios replied, "You say that you can't live in it anyway." In shock, Plaintiff replied, "that is not a reason to burn it." Melisa G. Rios and Perla R. Rios loved to talk about the occult and played with the OUIJA board. Plaintiff asked the same question a number of times while Melisa G. Rios and Perla R. Rios played with the OUIJA: "Is my house going to burn?" The answer was always YES. He would then ask, "Am I going to go to jail?" The answer was always NO. Plaintiff would then say, "My neighbor Cheryl (Roelle) is going to burn it and blame it on me." Plaintiff went along with the witchcraft theme as part of research. He drove to Sacramento to talk to Victor, a Santero witch doctor, and asked for something to keep his house from being burnt.

102.    On 4/15/15, the California Franchise Tax Board adjudicated the $850 left in Chase Bank without Plaintiff receiving notice, for unfiled taxes due to Plaintiff not having taxable income. Plaintiff did received a notice from Robert Half International informing that they were required to garnish Plaintiff's wages, per the California Franchise Tax Board. The Plaintiff believes Swan is responsible for that and the doubling of the Plaintiff's insurance premium and the doubling of the Property Taxes, both in 2013.

103.    A few days later, Roelle called to inform that she had seen The Property advertised in Zillow at $240,000. An RE investor placed the ad, without an authorization. Roelle then said, "Think of us before foreclosing." Later that day, during dinner Plaintiff described what had been going on to Maria J. Gurrola and, Rosalina Gurrola and Silvia Barraza. He was shocked when Silvia Barraza suggested "burning the property," as the solution. All he could do was shake his head. Angrily Plaintiff said, "burning a house on purpose is not only a crime against the community, but against Mother Nature."

104.    On 4/30/15, Plaintiff drove to Riverside, California to meet Andy, a Cuban Palero and asked, "So, Cheryl has a hex on me to burn my house, how much do you charge to send back the hex and have her burn her own house?"

105.     In early June 2015, the Plaintiff helped Cynthia, a Registered Nurse, move into Melisa G. Rios' home, paid Farmers premium and reached an agreement to meet with Carlos Naranjo at a Notary Public in San Bernardino to sign the sale of The Property at $365,000. He, also, met with David a would be arsonist, and said "This is not an offer, not an offer, not an offer. The Property is without power. There is a one way in and one way out of the canyon. And, there are cameras everywhere. The only people who could burn The Property are my neighbors and myself. But, I am not an arsonist."

106.     On 6/7/15, Plaintiff boarded Amtrak. He boarded the bus in Bakersfield to the Inland Empire and the driver announced a full road closure on the Southbound Highway 5, which required the Tehachapi detour. The Plaintiff arrived at 11:00 PM and left to Oro Valley, AZ with Elizabeth Gonzalez.

107.     Melisa G. Rios continued talking about burning The Property, even after the Plaintiff left California to Arizona and from there to Durango, Mexico.

108.     On 6/30/15, Plaintiff returned to The Property and within minutes, a black helicopter flew down onto Roelle's air space, facing the Plaintiff. It lingered in the air, about five feet from ground, for a few minutes and left. Only to return a few minutes later. And, left. Only to come back, again. The helicopter made four trips to Roelle's air space. Terrified, the Plaintiff left The Property the next day and drove to the Bay Area.

109.     On 7/1/015, upon arrival at Melisa G. Rios', she told the Plaintiff that she had given David $1,000 for him to burn The Property. And, that he was going to go for a second try on 7/4/15 to take advantage of fireworks. Angrily, Plaintiff yelled, "Are you crazy or what? You don't burn a house for the sake of burning it. Stop it." Later, the Plaintiff told Melisa G. Rios he wanted to talk to David. She replied, "He left to Mexico."

110.     On or around 7/6/15, the Plaintiff walked into Melisa G. Rios to find her and two police officers. Melisa G. Rios was crying. After the officers left, Melisa G. Rios said, "I have to tell Cynthia to leave." It didn't make sense. Cynthia was paying over $1,000 for a room. The officers coerced Melisa G. Rios into kicking the Registered Nurse out.

111.     On or around 7/10/15, Carlos Naranjo called and asked if the Plaintiff was going to sell him The Property. The Plaintiff replied, "Yeah. You know what, I am going to drop the price to $335,000. I will drive on the 15th, so we can go to a Notary Public. I want out." Carlos Naranjo replied, "Okay, just give me from July 15 to 31st free of rent. I

will start making payments on August 1st." Plaintiff replied, "That is fine. Just send me an email that says, I, Carlos Naranjo, offer $335,000 for The Property located at 23833 Whittier Street, Colton, Ca 92324 for $335,000 with everything in it." I will reply with "I accept your offer." And, we will have a valid contract."

112. On or around 7/13/15, the Plaintiff found Carlos Naranjo's offer in Gmail. The Plaintiff texted Sung Kim III to inform that he had a bonafide offer for $335,000. If his aunt wanted The Property, she would have to pay cash. Time was of the essence. Melisa G. Rios approached Plaintiff about Jesus Gurrola being evicted and, without a place lined up, had to move by July 17th. Plaintiff met with Jesus Gurrola and told him, "move to the house. The doors are unlocked and the gate is open. Pay me $1,500 for rent. I can take care of the remaining $700. I can do this for a year. In that year, prove to me you can make the payments and improve your credit and I will transfer ownership to you at what is owed. There is a tractor on The Property. Fix it and clean The Property and do whatever. There is an F150. A friend by the name of Luis has it. Pick it up. It is yours. Luis can hire you at $1,000 per week transporting cars to and from Vegas. All I am going to ask is that you do not talk to the neighbors. I am leaving to Chicago for good." Jesus Gurrola called on 7/17/15 to inform he was at The Property. The Plaintiff left to Chicago on Sunday, July 28, 2015.

113. The Plaintiff felt at ease with Noemi and her son Kevin and a few days later, met with Sam Agnello, Realtor and Noemi's brother-in-law, about becoming a Realtor in Illinois. And, they talked about a possible partnership in a house cleaning business.

114. On 8/5/15, Jesus Gurrola delivered mail to Plaintiff, but not the rent money. During dinner, Noemi suggested Plaintiff should sell The Property and use the proceeds to save her own house, as it was in distress." Plaintiff replied, "The Property is no longer mine for me to sell. I promised it to my brother."

115. On 8/11/15, Noemi told Plaintiff to move citing Kevin being uncomfortable with arrangement. Sam Agnello emailed rentals to Plaintiff, whom made calls and found that without a job, renting an apartment would not be easy. Plaintiff drove to his older brother's home in Bolingbrook where he continued to call listings.

116. On 8/14/15, Plaintiff opened the Reche Canyon Mutual Water Company bill, and found no water consumption. Plaintiff understood Jesus Gurrola didn't move to The

Property and stopped the search for a place as he determined the best thing was to return home and defend what was his, with his life if needed. He mailed the water payment and, at midnight, drove out of Bolingbrook, en route to California.

117. On 8/15/15, Melisa G. Rios called as Plaintiff drove across Oklahoma to inform that Jesus Gurrola had left The Property and was back at Mother's.

118. On 8/16/15, Plaintiff drove to Edinburgh, TX after a tire blowout. Jesus Gurrola called and said, "Mom knows you want to burn the house." Jesus Gurrola repeated three times, "I can do it." Plaintiff thought it was a joke in poor taste, but a joke, nonetheless. The Plaintiff said, "You will get about $30,000, the Property and chances are, you will get my share of the family home when it sells." Everything Jesus Gurrola said during that call went from one level of ridiculousness to the next. Then Jesus Gurrola asked, "do you want me to be seen or unseen?" Plaintiff jokingly replied, "I want you to be seen." Plaintiff realized it wasn't a game and said, "I don't want to be a part of this. I want nothing from it. You wait until I transfer the property to you. And, then you do whatever." None of what was said constituted an offer for Jesus Gurrola to burn.

119. On 8/28/15, the replacement rim for BMW arrived. Later that day, Plaintiff answered Jesus Gurrola's call. "We have room for you here in San Francisco." Plaintiff replied, "I've a home to go back to. I am going to fix up the rooms and rent them out."

120. On 8/29/15, the Plaintiff said goodbye to his relatives and took BMW to America's Tires to find they didn't have the tire and was told to return on Tuesday.

121. On 8/30/15, Jesus Gurrola called and asked, "Does the sun hit the garage?" Jesus Gurrola kept on with his ridiculousness. The Plaintiff's patience ran out and, in exasperation, yelled, "I am sick and tired of all this crap. Burn it." That was a desperate cry for Jesus Gurrola to get off his back. Plaintiff went on a fifteen mile walk while Cody Musee and Colt Musee jumped the gun and set The Property ablaze. The notion that the Plaintiff would believe that Jesus Gurrola had burnt The Property was the most ridiculous, yet. Jesus Gurrola sustained 3rd degree burns from neck down; he would not come near a fire. Furthermore, Jesus Gurrola has always done the opposite of what Plaintiff has told him to do or requested of him. The Plaintiff returned from the long walk to find a number of missed calls. He called the first number. Christa Kerr said, "Your house is on fire." All Plaintiff was able to muster was, "What the fuck?" Jesus

Gurrola texted: HOLY SHIT DUDE. YOUR HOUSE IS ON FIRE. YOU BETTER CALL THE HOUSE. Plaintiff did. Rosalina Gurrola, answered, "You must be so happy now that Jesus burned your house." Plaintiff said, "It wasn't Jesus."

122.     The burning of The Property was a "controlled burning." LaClair and his crew, as well as MVPD Officers, to include Officer Areh, were at The Property at the moment Colt Musee and Cody Musee set the place ablaze in order to prevent the fire from spreading to the Reche Canyon hills. And, since the Fire Department was at The Property, no one bothered to call 911.

123.     On 8/31, 2015, MVPD Officer Areh went back to The Property and wrote in his Police Report: CHERYL (MOTHER OF COLT AND CODY MUSEE) STATED THAT JESUS (UNK) HAD BEEN SEEN AT THE PROPERTY IN HIS DARK BLUE SUBURBAN. SHE STATED THAT HE HAD GONE TO BURN THE PROPERTY FOR INSURANCE REASONS. A witness was present when Roelle made that statement. The witness asked Roelle, "Are you sure for a fact?" Roelle didn't reply. Officer Areh filed a false police report. Farmers' Adriana Vargas called the Plaintiff to say that Jesus Gurrola had been seen at The Property as well as a small gas tank and wanted to interrogate him. Plaintiff called Jesus Gurrola and said, "If you left a candle burning on the last time you were at The Property, tell the truth." Jesus Gurrola replied, "I'm not going to self-incriminate." Farmers' Adriana Vargas sent a letter to Plaintiff and addressed it to The Property where she references California Insurance Code Section 790.03, which requires Farmers by law to advise Plaintiff pursuant to California Insurance Code §2071. Jose M. Villa emailed his contract. In his email, Villa stated, "I'm pleased to have the opportunity to assist you and settle your claim promptly without you having to come to California. Jesus Gurrola texted the following: BE ADVICED, I WILL BE CALLING YOU IN FIFTEEN MINUTES FROM A SEVEN ELEVEN PAYPHONE WITH A PREPAID CALLING CARD, BUT IT IS ME. Jesus Gurrola called and said that he opened the garage door for oxygen and turned on the stove for gas accumulation. Plaintiff said, "I think it was the neighbors who burned it." Jesus Gurrola said, "You better blame it on them, 'cause they're going to blame it on you."

124.     On 9/1/15, Villa, not yet having a contract with Plaintiff, called and informed that Roelle had stated to Farmers insurance adjuster, McDonald and to himself, "This property is key to me. I have to have it." Plaintiff rewarded Villa with a contract. And,

with new tire installed, Plaintiff drove non-stop to Chicago. Ruben Lopez called and insinuated that Plaintiff was the wrongdoer.

125. On 9/9/15, Villa called to inform that Farmers had hired a special fire investigator, Dan Bonelli. Also, Farmers was requiring a Recorded Statement, for which Plaintiff had to drive to TLC on 9/15/15.

126. On 9/10/15, Plaintiff arrived at 552 Third Avenue in San Bruno. Jesus Gurrola had told everyone that he had burnt The Property. Plaintiff told him, "Just because you didn't light the match, doesn't mean you're innocent. You knew the fire was going to happen. If I were you, I'd pack up and go to Mexico or you're going to go to jail." Jesus Gurrola replied, "I am not going to set a foot in jail."

127. On 9/12/15, the Plaintiff drove to Ochoa's, whom, as the owner of the cellphone plan, could have been the hacker. Ochoa seemed to know nothing of the fire.

128. On 9/14/15, Plaintiff's first impression of Villa was that of a weasel. "I don't need a hotel for a night. I need housing." The Plaintiff met with Lopez at The Property. Lopez said Farmers would be paying about $380,000.

129. Jesus Gurrola called saying, "I don't think you are going to have any problem collecting from the insurance." The Plaintiff replied, "Oh, I don't know about that."

130. On 9/15/15, Plaintiff walked in at TLC for the Recorded Statement call and was offered coffee. Shipley of Farmer's stated that Farmers would not be providing Housing Due to Loss of Use ("HDTLOU"). Shipley demanded cellular phone records from 8/15 to 8/31/15. Plaintiff told Shipley to get a court order, as the service plan was Ochoa's.

131. The Plaintiff answered his cell phone, "I have a buyer for the tractor. Scrap metal, you know. $1,000 bucks." And, that was Jesus Gurrola, unscripted. Plaintiff drove to Oro Valley, AZ to sniff on Gonzalez. Without a place to live, the Plaintiff remained at her place for close to two weeks. Gonzalez was nervous and guarded cellular zealously.

132. On 9/28/15, Villa called to inform that Farmers was adamant on the cellular records and, that Cody Musee had informed him of Kerr's visit to The Property to take the tractor. Villa informed that the property was off limits during the investigation, per Farmers. The Plaintiff drove to Ochoa's home.

133.    On 9/29/15, Ochoa called to inform the cellular phone records were ready. Villa called to inform he had the cellular phone records in his possession and that Farmers now required a Recorded Statement from Jesus Gurrola, as well as his cellular phone records. The Plaintiff notified Villa that Jesus Gurrola was willing to do the Recorded Statement, but not the cellular phone records. The Plaintiff suggested, "Have Shipley get a court order. I want to see them, too." Villa called back to say that Shipley was okay with not getting Jesus Gurrola's cellular phone records.

134.    Melisa G. Rios resumed the unlawful administration of opiates. Plaintiff, not only was subjected to the opiates, but daily bouts of mental abuse to include, "You wanted your house burnt," talk of suicide, witchcraft, spiritual possession and a Satanic Ritual. Melisa G. Rios, under supposed spiritual possession, would tell Plaintiff, 'you are obtuse," time and time again. Ochoa sent Plaintiff subliminal messages of incarceration: youtube videos. Elizabeth Gonzalez talked of suicide and ability to talk to "angels."

135.    On 11/6/15, Melisa G. Rios threatened to plunge a knife into her abdomen in front of daughter Perla. Just a few days prior, Melisa G. Rios had paid a $10,000 deposit on new ceramic teeth. Plaintiff took the knife away and said, "You are not doing this." Melisa G. Rios replied, "Get out of my house, you loser."

136.    On 11/9/15, Perla R. Rios called the Plaintiff and frantically begged Plaintiff to come back. Plaintiff found Melisa G. Rios drowsy. She claimed to have taken 27 pills.

137.    On 11/14/15, Jesus Gurrola called Melisa G. Rios and told her to inform the Plaintiff about the arrival of a special and official looking envelope. And, that the Plaintiff needed to pick it up "right then and there." The Plaintiff went to pick up envelope with Perla R. Rios and her father Juan M. Rios. The Plaintiff found 3 SBPD patrol cars parked at Angus Avenue and Third Avenue intersection and another doing a U-turn, but no signs of distress. SBPD were waiting for Plaintiff's BMW to create panic for the Plaintiff to flee or worse. SBPD officer Brandenburg filed a false police report. That night, with slippery roads, a BMW 740iL capable of speeds up to 140 miles per hour, combined with the state of mind of the Plaintiff could have resulted in multiple car wrecks, perhaps deaths.

138.    On 11/15/15, the Plaintiff thought about leaving to Mexico to keep Jesus Gurrola from jail, but after a couple of hours of debating, decided to stay. Melisa G. Rios was rushed to Kaiser Permanente. It was determined she had taken 67 pills and alcohol.

And, was then transferred to a Mental Ward in San Francisco and was released on Thanksgiving Day.

139. On 11/28/16, A diabolical ceremony was held at Melisa G. Rios' to further scare the Plaintiff where Juan M. Rios pretended to be under possession of an evil spirit. When he supposedly regained consciousness, Juan M. Rios claimed he was going to do a pact with Lucifer to get a shorter jail term for having sex with a minor. The Plaintiff had seen and heard enough. He gave his iPhone 5 to Raquel Rios and told her to throw it in Lake Merced. The Plaintiff went to Silvia Barraza's home. He had to leave the area, but couldn't drive in his condition. He walked up to 20 miles every night for 2 weeks.

140. On or around 12/15/15, The Plaintiff drove to Melisa G. Rios to find Ochoa had been calling. Ochoa told Plaintiff of an area near Cancun, Quintana Roo, Mexico, which was populated by Mexicans whom fled from USA. "It is really nice and cheap," Ochoa said of area. Ochoa claimed her brother Frank had tried committing suicide, but missed. The Plaintiff asked, "What do you mean he missed? A man who wants to take his life with a gun does not miss." The Plaintiff drove to Silvia Barraza and signed the title to the Toyota T100 and said, "Anything happens to me, do something with it." And, left.

141. The Plaintiff stopped in Oro Valley, AZ. Gonzalez awaited with a fresh pot of menudo. He ate one spoonful and waited. The hostess didn't serve herself. The Plaintiff left Oro Valley at 5:00 AM and within minutes, the check engine light came on. The BMW made it to Edinburgh, Texas and died. The Plaintiff arrived nothing short of a lunatic.

142. On 1/06/16, a much calmer Plaintiff, paid for bus ticket for travel on 01/09/16 to Durango, MX and disclosed plans to join a monastery to Elizabeth Gonzalez.

143. On 1/9/16, Plaintiff crossed into Mexican territory. Within an hour of crossing the border, Burgess hacked Plaintiff's MacBook Pro in front of his very eyes and crashed it, making of it a large paperweight.

144. On 4/9/16, the Plaintiff, with a clearer mind had the MacBook Pro fixed and found that he couldn't access Gmail. That same day, Plaintiff boarded a bus back to Edinburgh, where he used his cousin's computer, (he had used it prior to access Gmail). He found two emails from Farmers. However, when he entered 951-200-0925 to access additional information, he found it was no longer valid. Farmers had changed his access

code to block access. As long as the Plaintiff remained in Mexico, he would have been oblivious as to what Farmers had done.

145.    On 4/19/16, the Plaintiff got on his way from 552 Third Avenue to Silvia Barraza's place in San Bruno on foot. A man got out of a Black Lincoln at the Angus Avenue and Third Avenue intersection and started taking pictures of Plaintiff, an intimidation tactic. The Plaintiff found that the Toyota T100 was no longer his property.

146.    On 4/21/16, the Plaintiff walked back to 552 Third Avenue. Jesus Gurrola told Plaintiff. "About that, we are not going to talk about it ever again. Money was needed." Plaintiff didn't say a word. Later, Plaintiff contacted Gonzalez, whom claimed that "Angels" had told her a very large check made out to the Plaintiff had been cashed." The Plaintiff said, "I'd first believe you talk to Angels, then believe of a check made out to me having been cashed. Not in the US."

147.    On 4/29/16, Plaintiff called Villa to hear, "Remember I told you I could get money for you? I have the money. The question is, how do I get it to you?" The Plaintiff answered, "The legal way, Joe." Villa remained vague and evasive. The Plaintiff walked into a Farmers Office to find about the Check for $341,376.49, processed on 1/7/16.

148.    On 5/2/16, Villa refused to meet Plaintiff at his office. At a Starbucks, Villa confessed that Lopez had taken the Plaintiff's personal property, but claimed that the Plaintiff had signed authorization on the day of the Recorded Statement. Villa said that there had been two fires at The Property, but the cause was undetermined. And, that he had given the check to his attorney, whom "Pushed it through."

149.    The Plaintiff called Farmer's employee McDonald, whom knew Villa had cashed The Check on March 2. McDonald knew of the second fire as well as the theft of Plaintiff's personal property.

150.    On 5/4/16, Burgess hacked: THE THE THE CHECK, THEY THEY THEY HAD TO DO Q. I HAD HAD HAD TO DO QW1.

151.    On 5/5/15, the Plaintiff called Nationstar, which knew nothing of the fires as Villa never contacted them. The Plaintiff told Amber Robinson about the fraudulently cashed Farmers check. Sherrida Didier provided Wire Transfer information to the Plaintiff, whom pushed for Villa to wire the funds to Nationstar.

152. On 5/9/16, Chad Holmes emailed a copy of the check, front and back. The Plaintiff's signature had been forged. Villa had a rubberstamp made with the name of Nationstar and scribbled on the lines within the stamp, but he didn't sign the check and should have for check to be fully endorsed as Statewide Claim Advisors had been listed as a payee. Also, the check had been sent to Statewide Claim Advisors business address.

153. On 5/10/16, Villa wired $190,000 to Nationstar.

154. On 5/11/16, Plaintiff drove to MVPD and requested an officer be sent to The Property. Colt and Cody Musee approached the Plaintiff jumped. Roelle stood still, keeping her distance. Roelle said, "He was hiding in Mexico like a rat." MVPD Officer Questel, said MVPD knew of the email Plaintiff had sent to Villa and asked if anyone else had a stake on the property. Plaintiff replied, "I am a single man with no kids. The mortgage company and I are the only stakeholders." Officer Questel then said, "My boss says that your neighbor Cheryl owns a stake to the property." Plaintiff said, "Burning it doesn't give her ownership. Is your boss Sergeant Swan?" Officer Questel corrected, "Lieutenant Swan." Officer Questel then asked, "Has the insurance company granted you access back to the property?" Plaintiff replied, "I didn't know I needed one." Officer Questel insisted to the Plaintiff to get access and left.

155. On 5/11/16, McDonald emailed providing full access to property since they had completed their investigation of the cause of loss.

156. On 5/12/16, the Plaintiff found the house empty and a lot of demolition work had been done, but the second fire damage was obvious. Jose M. Villa went missing in action. The Plaintiff returned to MVPD and told Officer Hill about the theft of his personal property and of the fraudulently cashed check. According to his boss, the Plaintiff had to go to Rancho Cucamonga PD for the personal property loss. And, the Plaintiff was to find where the Farmers check had been cashed and initiate the investigation there. Plaintiff asked, "Is your boss Lieutenant Swan?" Officer Hill answered, "Yes." Plaintiff asked, "So, if the check was cashed in the Cayman Islands, do I have to go to Cayman Islands?"

157. On 5/12/16, Plaintiff emailed McDonald in reference to the demolition The next hack was: YOU ARE BEING OBSERVED, IF YOU MOVE FORWARD. Then another: SIX vs. ONE

158. On 5/13/16, McDonald emailed, "No claim was made for personal belongings at the time of loss via Joe's office as we were told none of the items were yours and that it was your prior tenants and your brothers. On a separate email, McDonald sent pictures of The Property. The Plaintiff drove to The Property at 12:15 AM. He got out of the car to open gate and was attacked by Roelle's Dobermans six times. In the morning, Plaintiff drove to the Riverside County Department of Animal Control ("RCDAC") and reported the attack. RCDAC did nothing about the Dobermans.

159. On 5/20/16, the Plaintiff emailed Chad Holmes to informed he was driving back to the Bay Area due to the dog attack and fact the dogs remained free. Also, he informed of a change of address to: 407 Piccadilly Place #11 in San Bruno, CA 94066.

160. Plaintiff helped with Melisa G. Rios' move to her new house in Richmond. She saw Raquel Rios and asked her to give him back his iPhone, but she replied that she threw cellular phone in Lake Merced. The Plaintiff saw Juan M. Rios whom claimed he was to spend 1.5 years in jail and wouldn't have to register as a sex offender. He credited his pact with Lucifer for the shorter jail term. The Plaintiff believes Juan M. Rios was hacked and through the hacking Burgess found about Juan M. Rios' 1.5 year relationship with his niece. It was due to a pact with a California Government official, not Lucifer, which required Juan M. Rios to scare the Plaintiff into leaving the United States in return for a shorter sentence and not having to register as a sex offender. Melisa G. Rios told Plaintiff to stay. And, without a place, he did. Melisa G. Rios resumed the Unlawful administration of pills without his knowledge or consent.

161. On 6/3/16, Farmers Chad Homes emailed additional information on The Check. U.S. Bank- was bank of 1st deposit. The sequence number is 7572442210.

162. On 6/6/16, Plaintiff walked into Eulalio Diaz' Farmers office with copy of The Check. Eulalio Diaz said, "If I were you, I'd go back to the property and stay until it forecloses, even if it has doesn't have power or water. Dog bites take the biggest bite out of our bottom line." Plaintiff called Shipley, who sounded extremely nervous, but denied having to do anything with denial of Housing Due to Loss of Use.

163. On 06/09/16, the Plaintiff emailed William (Bill) Payton in an effort to get him to push an investigation. Burgess hacked again, MY CHILDREN ARE IN A HOTEL. I AM READY TO FACE YOU. GO TO SUN PLAZA AND BRING GUN.

164. On 6/16/15, the Plaintiff met with Westbrook, whom said to the Plaintiff, "You look like the type of person who enjoys the best things in life." The Plaintiff looked like a homeless person. Westbrook's offer was $3,000 and 10% of monies collected.

165. On 6/17/16, the Plaintiff countered the attorney with $2,000 and 12% of monies collected. Westbrook turned it down. The Plaintiff paid $3,000 in cash to Miles & Westbrook. Per The Attorney/Client Fee Agreement, the Plaintiff entered into a contract with Miles & Westbrook and The Law Offices of Denise Jarman.

166. On 6/22/16, Plaintiff handed a notarized Affidavit of Forgery to Westbrook. And, showed Westbrook the text message from Villa claiming Plaintiff authorized Lopez to remove Plaintiff's personal property and told Westbrook to go after Ruben Lopez TLC.

167. On 6/23/16, Westbrook mailed the original Affidavit of Forgery to McDonald of Farmers. The Plaintiff told Westbrook, "McDonald is not going to lift a finger to investigate. He is involved in the conspiracy." Westbrook informed that Lopez had denied stealing Plaintiff's personal property.

168. On 7/8/16, McDonald emailed Westbrook saying that he had contacted Farmers Administration Office for a status on the policy and that he received notification that it was sent on 6/28/16, and that Personal Property file had not having been opened by Villa. McDonald also claimed that Brent Shipley did not deny HDTLOU. The most important item of the email is that McDonald acknowledged receipt of Affidavit of Forgery and stated that he had sent it to the correct department for investigation, but that as of 7/6/16, they had not received the original.

169. On or about 7/12/16, Plaintiff drove to Miles & Westbrook to look at the file from Farmers. It came without Recorded Statements, cell phone records or fire reports, in violation of California Insurance Code §2071. The Plaintiff stated, as he looked at The Check breakdown, "that is a blatant lie, if I ever saw one. There were two fires to The Property. Joe Villa confessed to the fact and the second fire is quite evident. The damage on the first fire was between $120,000 to $130,000. Farmers should've sought restitution." Westbrook said, "You should never talk to anyone about the second fire."

170. Melisa G. Rios repeatedly would say, "You wanted your house burnt. Jesus burnt your house. You have to pay Jesus $30,000."

171.    On 7/21/16, the Plaintiff drove to Oakland to pick up a wooden chest with drawers for Perla R. Rios. On his way back, instead of driving to Richmond, due to a lack of sleep and focus, he drove to San Francisco. He was a mess. Due to the extreme headaches, he thought he had developed a brain tumor. It wasn't just the headaches, but heat on his head that forced him to apply ice to his head three to four times a day for up to 20 minutes each time. The Plaintiff's testicles and penis had shrunk considerably. His mouth was always dry. And, no matter how much water he drank, he was always thirsty. His joints cracked. There was a burning sensation on the right side of his stomach. He suffered from loose stools that didn't go away. And, he had become sensitive to sunlight.

172.    On 7/23/16, the Plaintiff gave himself a black eye, (the right eye) at Melisa G. Rios. The next day, his left eye matched the right eye. The Plaintiff began to rub Serrano Pepper on his eyes. Melisa G. Rios or Perla R. Rios should have called the cops.

173.    On 7/25/16, Gonzalez insisted that the Plaintiff should go to The Property. The Plaintiff told her that it was Villa doing the hacking and that he thought McDonald and Villa were going to have him killed.

174.    On 7/28/16. Melisa G. Rios and the Plaintiff went to visit Maria J. Gurrola. Melisa G. Rios demanded $10,000 from Jesus Gurrola, whom, in turn, demanded $30,000 from Plaintiff for burning of The Property. Jesus Gurrola then came at the Plaintiff with a large Stilson wrench. The Plaintiff pointed to head, "Come on, do it. Aim right here. End it now. Come on." Jesus Gurrola backed off, but said, "You have to go back to your ranch."

175.    A very long cell phone hack appeared, in what appeared to be Afrikaans mixed with English. YOUR BROTHER PAID 2HOMELESS GUYS 2BURN. DON'T MAKE YOUR MOMMA CRY. LET BRUJA MUJER KNOCK SENSE INTO YOUR HEAD. YOU ARE OBTUSE. YOU ARE SO OBTUSE.

176.    On 08/10/16, Elizabeth Gonzalez on a Facebook conversation said that two white males burnt the Plaintiff's house for economic gain, but said they were repentant.

177.    Plaintiff drove to Las Vegas on the weekend of 08/13/16 and from there he planned to drive to Ontario, CA for the Examination Under Oath ("EUO") scheduled for 8/17/16. He called Gonzalez with new cellular number. Burgess hacked again. First, I KNOW WHERE YOU ARE. Then, JESUS IS WITH US. Plaintiff deleted the message. And,

typed, I WANT JESUS IN JAIL. And, then a hack came in with the first and last name initials of all of Plaintiff's nieces and nephews living in the Bay Area, as a threat.

178.    On 8/15/16, the Plaintiff drove to Farmers Headquarters wanting to reach a resolution with McDonald as he didn't want his nieces and nephews harmed. McDonald wouldn't come down. The Plaintiff drove back to the Bay Area.

179.    On 8/16/16, An early morning hacking message appeared on iPhone: SHARE AND JESUS WINS. Jesus Gurrola showed up at the San Bruno address minutes later. The Plaintiff told him, "People who suffer trauma as you did with third degree burns to 80% of your body, keep away from fires. No way you burned the house." Jesus Gurrola replied, "Not me. I love fires."

180.    On 8/16/16, Westbrook said to the Plaintiff, "Man, you really need to seek professional help." Westbrook had been alerted by McDowell Shaw Garcia and Mizell, ("Mizell") that Plaintiff had been at the Farmers Headquarters and told the Plaintiff to not approach McDonald.

181.    On 8/25/16, Mizell emailed Westbrook about Brizuela v. Calfarm, claiming Farmers had no duty to provide a copy of the recorded statement prior to the examination taking place.

182.    On 9/2/16, Westbrook handed Plaintiff a list of items Mizell was requesting for the EUO. Plaintiff told Westbrook to forget about the EUO.

183.    On 9/4/16, Plaintiff told Gonzalez that he knew she was involved in the burning of his house and the aftermath. Gonzalez told him to make sure it was HER killed and not a daughter. Melisa G. Rios approached Plaintiff with, "Javier, why aren't you eating?" Plaintiff didn't answer. "Eat!" She yelled.

184.    On 9/5/16, Plaintiff took BART to San Bruno and rubbed Serrano pepper in eyes in front of Maria J. Gurrola and Rosalina Gurrola. Astonished, they just watched.

185.    On 9/6/16, the Plaintiff gave himself a black eye in the presence of Maria J. Gurrola and Rosalina Gurrola whom watched with eyes opened wide, but didn't call 911.

186.    On 09/19/16, the Plaintiff asked Joel Westbrook, "Joel, level with me, are you working on my behalf?" Westbrook's pupils constricted to the smallest. "Javier, you should really seek mental help." The Plaintiff said, "It has been three months and you haven't followed up with US Bank or Nationstar or Bond Co. When, Joel?"

187.    On 10/1/16, Plaintiff drove to Los Alamitos Race Track and was knocked down by a not yet named filly numbered 276 that had gotten out of her stall. Plaintiff tried to help the Race Track owner's employees corral it. He had lost all reflexes, but something wasn't right. The other guys were raising their arms, which doesn't calm an animal, but does the opposite. The filly went for the weakest link, the Plaintiff, but only managed to step on Plaintiff's right toe, causing Plaintiff to fall on his back. The ranch manager exclaimed, "Spectacular fall, but I wouldn't give it more than an 8."

188.    On 10/8/16, the Plaintiff ran into Chase T. Miller on his way to The Property and said, "Can you believe this guy cashed the insurance check?" He, also, mentioned that he was being hacked. Chase T. Miller seemed quite nervous. Plaintiff resumed his walk and felt the driver side mirror brush his jacket as Cody Musee drove by. Feeling vulnerable in The Property, the Plaintiff drove to Santa Anita Race Track.

189.    10/9/16, Jose, Assistant Trainer to Hector Palma, hired the Plaintiff for Groom duties. Plaintiff had forgotten how to work with horses. And, what Jose taught him, Plaintiff would forget in a matter of hours. A horse bit him as Plaintiff stood between it and its sweet feed. Another horse kicked him. Plaintiff came close to getting into physical altercation with two grooms. He had become useless.

190.    On or around 10/18/16, Jose B. Pereda, a man who jumped bailed for a 6 kilos of cocaine charge years prior and back in the United States, messaged the Plaintiff on Facebook, urging the Plaintiff to call him. At his insistence, the Plaintiff called from a disposable cellphone from Best Buy. A few minutes after the call, Burgess hacked the disposable phone. Jesus Gurrola was behind Jose B. Pereda's insistence in order to have the Plaintiff's new cellular number.

191.    On 10/20/16, at 5:00 AM, the Plaintiff was fired on his 50th birthday. And, he had walked 19 horses the day before, when the average hot walker walks 6. Hours prior, the Plaintiff got a ticket for driving without registration or insurance. He drove back to The Property to find a large Drone flying above Roelle's property, pointing a red beam at the Plaintiff. Scared, the Plaintiff left to Manteca.

192.    On 10/24/16 the Plaintiff found that Villa had been arrested on other Insurance fraud cases.

193.     On 10/31/16, the Plaintiff walked into Miles & Westbrook's new office and asked, "Villa being in jail, what does that mean for us?" Westbrook replied, "Well, it will make it easier to collect from the banks. And, if you want to sue him personally, you can." The Plaintiff replied, "No, that guy is a wolf. I bet he has everything in a family trust. We wouldn't be able to touch a cent." Then Westbrook asked, "Do you want me to talk on your behalf to the Department of Insurance?" The Plaintiff replied, "No, I am going to approach the prosecuting attorney in return to immunity." Then, the Plaintiff asked, "Hey, Joel, did you take a bribe from McDonald?" Westbrook's face turned red, began to cough uncontrollably and his eyes became watery.

194.     On 11/3/16, Burgess hacked: YEAH, I AM AT WORK, BECAUSE I HAVE TO. AND, YEAH, I HAVE NOTHING. BUT YOU, YOU HAVE TO GO TO THE GARAGE THAT BURNED. I WILL BE THERE. JUST A FEW DAYS LEFT. The Plaintiff walked into Miles & Westbrook with cellular phone recording while accusing Westbrook of revealing confidential information to third parties.

195.     On 11/7/16, the Plaintiff drove into The Property at 2:20 AM, there was nobody waiting. In the morning, he drove to MVPD and asked for Chief Ontiveros. Instead, he stated his concerns to include the fires, the unlawful cashing of check, theft of his personal property and the hacking to Captain Kurylowicz whom regurgitated what Officer Hill had said back in May in regards to The Check and theft of personal property. Kurylowicz stated that they didn't have a technical department to deal with technology crimes. Plaintiff drove to Cal-Fire to talk to Brandi McLaughlin on questionable Demands from CAL-FIRE. The Plaintiff asked about the second fire. "We were not summoned." The Plaintiff drove to Perris PD to find that Swan was still a Sergeant.

196.     On 11/8/16, Plaintiff walked from Adams at 12:15 AM to The Property and turned around about 40 yards from the gate in a hurry as the Dobermans came out of The Property and gave chase. He was able to reach the F150. The Plaintiff went to RCDAC and reported the dog attack, again.

197.     On 11/9/16, Plaintiff met with the RCDAC officer at Whittier and Adams. The Plaintiff told the officer the neighbors had attempted against his life using the dogs as the weapon. In the afternoon, the RCDAC officer assured Plaintiff it would be safe to return to The Property.

198.    On 11/10/16, Plaintiff arrived at 12:15 AM and drove into The Property and found the Dobermans next to the detached room. The dogs attacked and came within inches. Plaintiff called 911 and was told that RCDAC would arrive shortly to pick up the dogs. Officer Scott of MVPD arrived at 1:15 AM. The Dobermans walked out of The Property and went to bark at the officer, aggressively. In the morning, the Plaintiff called and asked RCDAC Lieutenant Houseman why they didn't show up for the Dobermans. Lieutenant Houseman was very condescending, at first. Then, he yelled that the dogs were confined.

199.    On 11/13/16, a group of motorcycle riders on big and loud motorcycles rode up Whittier Street, Hells Angels style. The Plaintiff recalled Roelle's threat. Yet, stayed.

200.    On 11/15/16, two large men drove onto The Property and yelled, "We are with the bank. We are here to change the locks. This house no longer belongs to you. You need to get the heck out of here." The demeanor of the two men was that of Law Enforcement or Fire Fighters. After watching the men change the locks on the two access doors, the Plaintiff left and sent a couple of emails to Westbrook demanding help. Miles & Westbrook walked away from case. The Plaintiff drove to 552 Third Avenue.

201.    On 11/23/16, Rosalina Gurrola told the Plaintiff, "The house is no longer yours. You don't have money. You can't go back to Raquel. You can't go back to Melisa's. What are you going to do, Javier?" The Plaintiff replied, "I can tell you one thing: I won't take my own life. I won't do that." Rosalina Gurrola continued, "What are you? You are not a man, Javier. What are you?" She continued, "You are not taking this house from me." From that day, Rosalina Gurrola intercepted all of the Plaintiff's mail for the next 18 months in order to perpetuate the lie that Roelle was the new owner of The Property.

202.    On 11/25/16, Jesus Gurrola approached Plaintiff at Artichoke Joe's, a casino in San Bruno. Plaintiff said, "I don't want to talk to you. You will go to jail." Jesus Gurrola replied, "Well, I'll have a roof, three meals and medical." Jesus Gurrola continued, "You had so many things in that house, and all for Cheryl to end up with everything, including the house." The Plaintiff turned to Jesus Gurrola and said, "I offered the property to you. You had an opportunity to keep the property and everything. What is wrong with you to throw all that away for Cheryl to keep the property." Jesus Gurrola replied, "You pretended to be in Texas but you yourself burned the house because you were broke. All

of your four businesses went bankrupt. I have documents saying so." The Plaintiff said, "I had over $110,000 in the bank and a $29,000 credit line prior to Cheryl started fucking with everything. I had no money problems." Jesus Gurrola said, "yeah, well, Farmer's don't know that." The Plaintiff said, "They will. There is the recorded statement with you and Brent Shipley." Jesus laughed. "There is nothing, Javier. Nothing. No recorded statement. We should take care of this right now. You and I." The Plaintiff followed him near Belle Air Elementary and stopped in front of the train overpass where there was a camera. Jesus Gurrola came back with a wrench, which he swung. The Plaintiff blocked it with his computer bag. He then dropped the bag and pointed at the right side of his head. "Right here. Come on. Hit me right here. End it. Do it, now." Jesus Gurrola backed off. The Plaintiff yelled, "I lost my house, you'll lose your daughters." It wouldn't be the last time Jesus Gurrola attacked the Plaintiff. The next time he threw a cup of coffee at the F150 as the Plaintiff was about to drive onto El Camino Real. Jesus Gurrola confessed to it via text message and said the idea was not to burn the Plaintiff, but to impede his vision. Jesus Gurrola was also involved with the 12/5/17 drugging of the Plaintiff with a hallucinogen at San Bruno Park. He called the next day, but didn't say a word, probably to find out if the Plaintiff was dead or alive.

203.    On 11/29/16, Perla R. Rios, told the Plaintiff to stay in "her house." Melisa G. Rios said, "now that Cheryl is the new owner, there is no evidence. Nobody is going to jail. Not Cheryl, not Elizabeth, not Jesus, not Rocio." Plaintiff said, "for this to stop, Cheryl has to return my property." Melisa G. Rios laughed, "That will never happen. Joe Villa is the most guilty. And, he is already in jail. What you need to do is get yourself a gun and go after Cheryl."

204.    On 12/27/16, the Plaintiff found out that Jesus Gurrola had lost custody of the two youngest girls. The Plaintiff had nothing to do with it.

205.    On 01/6/17, Melisa G. Rios kicked Plaintiff out, again. Plaintiff drove to Point San Pablo and parked. He felt a very strong pain in the chest area that knocked him onto the passenger seat. For hours, he was unable to move and figured it was a heart attack. He dialed 9, but not 11. There was no point. His life was over. He had no house, no family, no friends, no money. He didn't even have the right frame of mind to work. At 10:40 PM, he forced himself out of the F150 and walked for six hours. Plaintiff went back

and told Perla Rios about the heart pain. Melisa g. Rios wasn't happy to see him, but said, "That was not a heart attack." A few days later, the Plaintiff returned to confront Melisa G. Rios and asked, "What would you have done if I had run with your $80,000?" He drove to San Bruno, as homeless.

206. On or around 3/20/17, Plaintiff picked up his complete file from Westbrook. He found a letter from Nationstar Mortgage, dated 12/7/16, where it states having received the $190,000 wire.

207. For the next two years, Burgess continued hacking on a regular basis with threats to keep the Plaintiff stressed out. In May, 2017, Burgess hacked again: AZ$, 8A$, 3GU$. That meant Gonzalez in Arizona got money. Ochoa got money. Three Gurrolas got money. Then another hack. NO 6 A. The number 6 meant F. NO FEDERAL AUTHORITIES. Plaintiff deleted and typed. JUST A FEW DAYS LEFT. WHAT'S YOUR OFFER? The reply hack was WWILLUWEWSU: WE WILL KILL YOU WHERE EVER WE SEE YOU.

208. On 5/14/17, Mother's Day. Burgess hacked again: WE JUST PAID HYTMAN. Plaintiff erased message and typed: YOUR HITMAN IS ONLY AS GOOD AS HIS ABILITY TO FIND ME. Within an hour, Plaintiff and Burgess were standing shoulder to shoulder at the Starbucks on Mt. Vernon in Colton.

209. On 5/16/17, the Plaintiff left a backpack in sauna at the YMCA with close to $9,000, as bait.

210. On 05/20/17, Burgess hacked in code: YOU GOOFED. SAW YOU BY XXX, THEN BY TGIF. THANK YOU FOR YOUR GIFT. THANK YOU FOR YOUR GIFT. THANK YOU. XV. The $1,500 he took from the YMCA in Redlands. The Plaintiff deleted the hacked message and wrote: NO, YOU GOOFED. I NOW KNOW WHAT YOU LOOK LIKE. AND, YOU WILL PAY. Within seconds, Burgess gave Plaintiff another paperweight by disabling the Plaintiff's iPhone. On 1/6/18, The Plaintiff met Paola Akompong, Burgess' wife. On 1/14/18, Paula Akompong, unsuspecting, told the Plaintiff plenty of information on Burgess.

211. On 1/31/18, the Plaintiff went to ESRI and asked to talk to the owner. Instead, the Plaintiff was sent to Arrowhead Regional Medical Center on a 5150 based on Redlands PD Sergeant Alexander. Arrowhead kept the Plaintiff for more than the 72

hour hold and didn't tell the Plaintiff his rights and coerced him to take medication despite the Plaintiff repeatedly telling doctors he didn't want to take pills.

212. On 3/13/18, the Plaintiff went to the San Bruno City Council Meeting and told the Chief of Police Barbarini about the SBPD involvement in the conspiracy. Barbarini's reply was, "That is preposterous."

213. On 4/3/18, Plaintiff walked into MVPD and told Sergeant Stens that he was there to file a formal complaint against Sergeant Swan and Officer Aher. Sergeant Stens handed him the police report CHERYL (MOTHER OF COLT AND CODY MUSEE.) Plaintiff asked for a copy. Sergeant Stens denied him. The Plaintiff told Sergeant Stens that Roelle's accusation called for two things: A). The Plaintiff's right to defend himself in court. B). The duty of MVPD to investigate such allegations. Plaintiff said, "You guys should have brought Jesus Gurrola in for questioning. Maybe you should have brought me in for questioning."

214. On 4/17/18, the Plaintiff went to MVPD and asked about the Aher police report. Sergeant Stens had already deleted it from the system. The Plaintiff walked into the Moreno Valley City Council Meeting and took the mic and made a formal and public accusation on whom had burned the house. The MVPD Chief of Police was there, The Fire Marshall was there as was the Mayor and other MVPD officals. The accusation fell on deaf ears.

215. On or about 11/2/18, the Plaintiff went to SBPD and pleaded with them to call the Redlands PD and have them talk to Burgess about stopping the hacking. The SBPD officer said, "We can't do that."

216. On 12/19/18, the Plaintiff walked into the San Mateo Police Department and told Officer Wong that he was going to stay in San Mateo and that he had been the victim of a conspiracy that included the SBPD, his siblings and officers from Southern California, basically asking for protection. Instead, San Mateo PD began harassing the Plaintiff and went as far as destroying the Plaintiff's property to include the T100.

217. On 3/8/19, Plaintiff walked into the San Mateo County District Attorney's and asked Inspector Rick Decker to investigate the SBPD and his siblings. Inspector Decker told Plaintiff "You are mentally ill and delusional. There was an email exchanged between Plaintiff and Inspector Decker. Then Decker blocked the Plaintiff.

218. The conspirators continued to add more law enforcement officers and other random people to use as wedges in an effort to break down the Plaintiff. Since 12/15/18, the day the Plaintiff stopped using the MacBook Pro and the iPHone, San Mateo PD led by an YMCA member only known to the Plaintiff as Kevin SUI, stole two bikes from the Plaintiff, destroyed a third bike with a metal grinder, broke three locks at the YMCA, maliciously damaged the Plaintiff's T100, grinded a metal plate enough to create a sharp edge on the Plaintiff's storage locker at Public Storage , started using Hydro flasks to physically hack the Plaintiff as to say, "You are being observed." The San Mateo PD have followed the Plaintiff a few times, blocks at a time while the Plaintiff was on foot or driving. The San Mateo PD knows the Plaintiff's truck is not registered, but have not cited the Plaintiff. Also, the San Mateo PD have used an African American employee of the City of San Mateo by the name of Raymont, a Mexican named Diego and a Russian named Natalya to threaten, scare and even drugged the Plaintiff in an effort to keep the Plaintiff from filing the civil complaint. And, after the Plaintiff filed the complaint, they sent another man never before seen by the Plaintiff to tell the Plaintiff to go back to work and to drop the complaint.

FIRST CAUSE OF ACTION
Unreasonable Search and Seizures 42 U.S.C. §1983 - Fourth Amendment

219. The Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth hereat.

220. Defendants, their employees and agents violated the Plaintiff's Fourth Amendment rights to be free from unreasonable search and seizures of his property by confiscating and/or destroying the Plaintiffs real and personal property without a warrant-acts carried out under the color of State law.

221. The 4th Amendment is designed to safeguard the public's legitimate or reasonable expectations of privacy. The acts of the Defendants, their employees, agents and co-conspirators is a blatant violation of the Plaintiff's right to Privacy.

222. These unlawful actions were done with the specific intent to deprive the Plaintiff of his constitutional rights to be secure in his property, and to enjoy his property. The Plaintiff was denied even the right to sell The Property.

223. The Plaintiff is informed and believes that the acts of the Defendants, their employees, and agents were intentional in failing to protect and preserve Plaintiffs' property and that, at minimum, the Defendants were deliberately indifferent to the likely consequences that their actions could bring about in violating constitutional law.

224. As a direct and proximate consequence of these unlawful acts, the Plaintiff has suffered and continues to suffer loss of his real and personal property and is entitled to compensatory damages for his property and personal injury.

SECOND CAUSE OF ACTION<br>Equal Protection of the Law; 42 U.S.C. § 1983Fourteenth Amendment

225. The Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth hereat.

226. The Plaintiff is claiming that his rights to Equal Protection of the law, pursuant to the Fourteenth Amendment based on a Class of One, was denied by the Moreno Valley Police Department, the Riverside County Sheriff, the Redlands Police Department, the San Bruno Police Department, the San Mateo Police Department and the San Mateo County District Attorney. The Plaintiff went to each jurisdiction requesting help and seeking an investigation of the wrongdoings. The Plaintiff's pleadings fell in deaf ears. And, in doing nothing, the aforementioned jurisdictions denied him Equal Protection of the Law, a Fourteenth Amendment Right per 42. U.S.C. § 1983, which states, "No State shall deny to any person within its jurisdiction the Equal Protection of the Laws.

227. The Plaintiff alleges that the different treatment was intentional and that there is no rational basis for the difference in treatment.

228. The Plaintiff was singled out because he defended his Fourth Amendment right in denying MVPD access to The Property without a search warrant on Nov 2010. The subsequent denial was due in support of the Police Brotherhood to keep Swan and the co-conspirators from paying for their crimes perpetuated against the Plaintiff.

229. As a direct and proximate consequence of the denial of the Equal Protection of the Law, the Plaintiff has suffered and continues to suffer loss of his real and personal property and is entitled to compensatory damages for his property and personal injury.

### THIRD CAUSE OF ACTION
Right To Due Process Of Law; 42 U.S.C. § 1983 Fourteenth Amendments

230.    The Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth hereat.

231.    Defendants, their employees, and agents, acted against the Plaintiff's Fourteenth Amendment Rights to Due Process of Law which provides that "nor shall any State deprive any person of life, liberty or property without the Due Process of the Law." The Plaintiff invokes the Procedural Due Process protection clauses of the Fourteenth Amendment to the U.S. Constitution given the involvement of a number of police officers involved in denying the Plaintiff his Right to Due Process.

232.    Despite the US Constitution Due Process of the law protection, the Defendants, their employees, and agents marched forward with their plans to burn The Property and deny the Plaintiff of his constitutional rights in destroying real and personal property. Their actions were deliberate and malicious in a blatant disregard for the law. They have continued to take the Plaintiff's property to include six racing bicycles and the one they couldn't take, they destroyed with a grinder. Also, they caused significant damage to the Toyota T100's bumper and hood.

233.    Defendants, their employees and agents have seized and/or destroyed the personal property of the Plaintiff without due process, lawful justification, or just compensation.

234.    As a direct and proximate consequence of the acts of Defendants, their employees, agents and co-conspirators, the Plaintiff has suffered and continues to suffer loss of his real and personal property and is entitled to compensatory damages for his loss of real and personal property and other injury to his person.

### FOURTH CAUSE OF ACTION
Civil Rights: 42 U.S.C. §1983-Fourteenth Amendment-State Created Danger

235. The Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth hereat.

236. The planning and deliberate burning of the Property, which was carried out under the color of State law. The officers involved did not conduct themselves in good faith. Therefore, they are not entitled to Qualified Immunity.

237. Furthermore, the Defendants acted against the Plaintiff in the denial of housing, interfering with the mechanical soundness of the vehicles driven by the Plaintiff with the intention to injure, the SBPD set up on 11/14/2015, the multiple personal physical attacks to include the attacks of the Dobermens as well as attacks with innate objects carried against the Plaintiff, drugging of the Plaintiff with medications not prescribed to him and without his knowledge or consent, and with an unknown substance, all acts of Defendants, their employees, agents and co-conspirators, have created a danger not only for the Plaintiff but for the public, as well.

238. By exposing the Plaintiff to his current state of homelessness as a direct and proximate consequence of the acts of Defendants, their employees, agents and co-conspirators, the Plaintiff has suffered and continue to suffer actual and potential injury to his health and safety and is entitled to compensatory damages.

## FIFTH CAUSE OF ACTION
### Violations of Civil Rights 42 U.S.C. §1985
### Fourteenth Amendment-Conspiracy to interfere with Civil Rights

239. The Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth hereat.

240. The Conspiracy Statute states that If two or more people in any State conspire or go on the premises of another, for the purpose of depriving, either directly or indirectly, any person of the equal protection of the laws, or of equal privileges and immunities under the laws, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

241. The Conspiracy against the Plaintiff is the brainchild of Swan and Gurganious, under the Color of State law to deny the Plaintiff his civil rights, which is protected by

40

the 14th Amendment of the US Constitution. The conspiracy grew in numbers of people, some of the co-conspirators acted on their own volition, others were incentivized and some under coercion. Regardless of the reason of their participation, the Defendants, their employees, agents and co-conspirators, acted against the Plaintiff's civil rights and resulted in the Plaintiff's loss of Real and Personal property, health, all familial relationships, near and afar and all friendships, near and afar.

242.   The Conspiracy was formed to make the Plaintiff pay for the hurt he imposed on Swan's ego when the Plaintiff refused to be apologetic and issue a promise of never to listen to Mexican music. The Plaintiff was in his Property and the music was not loud. The second reason was for Roelle to end up with the property, as the property was key in the re-establishing of a long ago lost 60 foot easement which is instrumental in the development of three properties totaling 112 acres, directly behind The Property. Roelle was to get a few acres from Marko Uljik behind her property to build a home for one of her sons and would have enough land on The Property to build another house for her other son. The Plaintiff offered to sell them the Property. They decided to burn it.

243.   Roelle, Rojas, Chase T. Miller, Martinez, and the Musees without Swan and Gurganious would not have been able to carry out what they did. Swan, Gurganious and Burgess changed everything.  When the Plaintiff refused to believe that Jesus Gurrola had burnt the Property, the conspiracy grew to cover their crime and their acts against the Plaintiff grew bolder and in gravity in terms of unlawfulness.

244.   The Defendants, their employees, agents and co-conspirators actions subjected the Plaintiff to being drugged without his knowledge or consent, which combined with extreme fear and stress may have damaged the Plaintiff's heart beyond repair and other chronic health issues.

245.   The Defendants, their employees, agents and co-conspirators knew, or should have known of the legal implications that conspiring of an unlawful transaction may bring about against their persons. Their unwillingness to pay for their acts have pushed the conspirators to act against the Plaintiff's life. And, in doing so, compounded the Plaintiff's pain and suffering for it affected the Plaintiff's mental and physical well-being

246.   Defendants committed the acts and omissions alleged herein with intent and/or reckless disregard for the rights of the Plaintiff in order to protect the Conspirators.

247. The Plaintiff is informed and believes that Defendants, their employees, their agents and co-conspirators continue to conspire against the Plaintiff.

248. As a result of the actions of Defendant and their agents and employees, The Plaintiff has suffered injury to his persons and property and is entitled to damages.

SIXTH CAUSE OF ACTION
18 U.S.C. §2510 et seq. Electronic Communications Privacy Act

249. The Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth hereat.

250. The Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2510 et seq. referred to as the "ECPA"regulates wire and electronic communications interception and interception of oral communications and makes it unlawful for a person to willfully intercept, endeavor to intercept or Procure any other person to intercept, or endeavor to intercept any wire, oral or electronic communications within the 18 U.S.C. § 2511(1).

251. Defendants, employees and their agents violated Section 2511(1)(a), a blanket prohibition against the intentional interception, endeavor to intercept, or procurement of another person to intercept or endeavor to intercept any wire, oral, or electronic communication. The vulnerabilities inherent in Apple's MacOS and iOS made it possible for the unlawful interception of the Plaintiff's oral and/or electronic communications. The intentional interception of the Plaintiff's electronic communications was done without the Plaintiff's knowledge, consent or authorization.

252. Defendants, employees and their agents violated Section 2511(1)(c) by intentional disclosing or endeavor to disclose to any other person the content of the Plaintiff's electronic communications knowing or having reason to know that the information was obtained through unlawful interception of the Plaintiff's electronic communications.

253. Defendants, employees and their agents violated 2511(1)(d) by intentionally using or endeavoring to use the content of the Plaintiff's electronic communications, with knowledge or having reason to know that the electronic communications were obtained through interception for an unlawful purpose.

254. The Plaintiff is a person whose electronic communications was intercepted or intentionally used in violation within the meaning of the 18 U.S.C. § 2520.

255. Defendants have publicly admitted that its products to include the MacOS and iOS are, indeed, vulnerable and deficient to hacking and, thus, allow for unlawful interception of wire, oral and electronic communication to occur.

256. The Plaintiff has suffered loss by reason of those violations without limitation and the violation to his right to Privacy. Defendants, their employees and agents are liable, directly or vicariously. The Plaintiff, therefore, seeks remedy as provided for by the18 U.S.C. § 2520 such as Preliminary and other equitable or declaratory relief as deemed to be appropriate and damages consistent with subsector (c).

SEVENTH CAUSE OF ACTION
18 U.S.C. §1030 et seq. the Computer Fraud and Abuse Act

257. The Plaintiff realleges and incorporates the allegations set forth in the Preceding paragraphs as though fully set forth hereat.

258. The Computer Fraud and Abuse Act, "CFAA" regulates fraud and related activity in connection with computers and makes it unlawful to intentionally access a computer used for interstate commerce or communication without authorization or by exceeding authorized access to such a computer within the meaning of 18 U.S.C. §1030(a)(2)(c). The Plaintiff's computer is a protected computer within the meaning of18 U.S.C. §1030(a)(2)(b).

259. The Defendants, employees and agents are in violation of the Computer Fraud and abuse Act 18 U.S.C. §1030 for producing or contribute to the production and, thereby the sale of deficient and vulnerable products to the public, thus making the buyer or user vulnerable to hacking.

260. The Defendants, employees and their agents violated the 18 U.S.C. §1030(a)(5)(A)(i), which makes it illegal to "knowingly cause the transmission of a program information code or command and as a result of such conduct intentionally cause damage without authorization to a protected computer.

261. The Defendants, employees and their agents violated the 18 U.S.C. §1030(a)(5)(A)(i), which makes it illegal to access a protected computer and as a result recklessly caused damage to Plaintiff's computer by imparing the integrity of data and or information.

262.     Defendants unlawful access to the Plaintiff's computer and electronic communications has caused irreparable injury. Unless restrained and enjoined, Defendants will continue to commit such acts against the Plaintiff. The Plaintiff is entitled to remedies including injunction relief as provided by 18 U.S.C. §1030(g).

### EIGHTH CAUSE OF ACTION
Intentional Infliction of Emotional Distress-Caci No. 1600

263.     The Plaintiff realleges and incorporates the allegations set forth in the Preceding paragraphs as though fully set forth hereat.

264.     The Plaintiff claims that the Defendants, they employees, agents and the co-conspirators behavior was outrageous and intentional and directed against the Plaintiff to injure him and his property. The Defendants had no boundaries and used anyone close to the Plaintiff to reach their objective and did so with a blatant disregard for the law.

265.     The Defendants, their employees and agents acted in unison, regardless of whether they acted on their own volition, or were incentivized or acted under coercion or undue pressure, all pursuing the same objective: to injure the Plaintiff.

266.     The Defendants, their employees and agents hacked, drugged, and lied to the Plaintiff to keep him from selling The Property.

267.     The Defendants, their employees and agents burned The Property and when the Plaintiff announced that he believed the neighbors had burned the house, the Defendants conspired with Farmers and the Public Adjuster to keep the Plaintiff without a place to live. And, the Defendants, their employees and agents knew that the Plaintiff would return to Melisa G. Rios where she could continue drugging the Plaintiff, without his knowledge or consent. The Plaintiff was subjected to extreme fear, talk of suicide and diabolical possession. They hoped the Plaintiff would either leave the United States for good or commit suicide. The Plaintiff left, but was hacked immediately and denied further use of MacBook Pro.

268.     Defendants, their employees and agents regrouped upon the Plaintiff's return to The Bay Area in order to keep the Plaintiff from finding a legal recourse, the defendants continued to drug the Plaintiff. They subjected the Plaintiff to extreme fear with the threats coming from the hacker. In addition, there were multiple attacks against

the Plaintiff's life, some with dogs. The Plaintiff's siblings kept him from receiving any type of mail for 18 months in order to perpetuate the lie that his Property was no longer his. Once the Plaintiff went to live in the streets and his siblings couldn't drug him further, the hacking continued and more often.

269. The Defendants actions resulted in the Plaintiff becoming homeless where he was exposed to the elements. Living in San Francisco Bay represent serious risk for the homeless, especially in the winter months with cold weather and wind could result in fever and hypothermia. The Plaintiff's homelessness has resulted in muscuskeletal and chronic pain, which resulted from two hard falls and the sleeping on hard and uneven surfaces.

270. The Plaintiff started living as a homeless person with extreme pain in the heart area. According to a number of EKGs, it wasn't a heart attack. The Plaintiff doesn't know what causes the pain for a referral to a cardiologist has been denied by a couple of doctors, but it is extremely painful, at times. However, the Plaintiff believes his heart ache is due to either the fear experienced or the unlawful administration of medication or a combination of the two.

271. The Plaintiff has been sleeping on hard and/or uneven surfaces, combined with two hard falls and walking with a defeated stance have resulted in a gradual malformation of the back to include a severe kyphosis, hunchback, and malformations on the right back side, lower back pain, hip pain. In order to reduce the levels of pain, the Plaintiff spends close to two hours daily of stretching and other exercises. In addition, the Plaintiff has experienced chronic foot pain resulting from long periods of walking and standing and repetitive minor trauma, as well as a foot infection caused by extended periods of time of exposure to moisture.

272. The Plaintiff has lost all sexual interest as his penis and testicles were reduced in size, caused either by the high levels of cortisol due to the fear or the unlawful administration of drugs or a combination of the two.

273. The Defendants are responsible for the two falls suffered by The Plaintiff, which were planed with malicious intent.

274. The Defendants, their employees and agents are responsible for the Plaintiff getting fired from three jobs without a reason having being stated. The Plaintiff beliefs

the firing was done by threats coming from the Conspirators in order to bring the Plaintiff to the edge.

275.     When the Plaintiff found out the Hacker's name, he approached ESRI, Burgess' employer, seeking for the hacking to stop. Instead, the Plaintiff was sent to Arrowhead where he was kept against his will, without being informed of his rights, and coerced into taking medication, despite telling a few doctors he didn't want to take pills. On top of it, he was kept longer than the 72 hours.

276.     The Plaintiff sought help from San Bruno PD to stop the hacking. The response was, "we can't do that." He then went to San Mateo PD, but instead of finding help and/or protection, San Mateo PD joined the conspiracy to protect the Police Brotherhood and in doing so destroyed the Plaintiff's personal property to include damage to the T100.

277.     As a direct and proximate result of the acts and omissions of Defendants, their employees, agents and co-conspirators, the Plaintiffs have suffered and continue to suffer injury, including but not limited to pain and suffering. The Plaintiff is entitled to damages to include punitive damages.

### NINTH CAUSE OF ACTION
California Civil Business and Professions Code §17200 et seq.

278.     Plaintiffs realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth hereat.

279.     California Business & Professions Code §17200 et seq. prohibits any "unlawful, unfair or fraudulent business act or practice" and any "unfair, deceptive, untrue or misleading advertising." California Business & Professions Code §17200 et seq. is not confined to anticompetitive business practice but is equally directed toward the right of the public to protection from fraud and deceit. And, any person who engages, has engaged or proposes to engage in unfair competition may be enjoined in any court of competent Jurisdiction as the list of potential defendants doesn't end with the actual perpetrators of unlawful, unfair or fraudulent acts. However, there is no vicarious liability under §17200 et seq., rather the liability of each defendant must be predicated on his or her own personal participation in the unlawful practice.

280.     The Plaintiff invokes Conspiracy to Violate §17200 et seq. The Defendants, their employees, and agents engaged in unfair competition. Defendants conduct in this regard is ongoing and include, but it is not limited to statements made by Defendants, their employees and agents and Defendants' omissions, including as set forth above.

281.     By engaging in the described above acts and practices, the Defendants, their employees and agents committed one or more acts of Unfair Competition within the meaning of Unfair Competition Law and as a result, the Plaintiff has suffered injury-in-fact and has lost money, personal information, the expenses of investigation, real and personal property, health and familial relationships and friendships.

282.     The Defendants, their employees and agents business acts and practices are unlawful, in part, because they violate California Business and Professions Code 17000 et seq, which prohibits False Advertising, in that they were Untrue and Misleading statements relating to Defendants' performance of services and with the intent to induce consumers to enter into obligations relating to such services and which Statements Defendants knew or with by the exercise of reasonable care, Defendants should have known were Untrue and Misleading.

283.     Defendants business acts and practices are also Unlawful in that they violate the California Consumer Legal Remedies Act, The California Civil Code Section 1750 et seq, Title 18 U.S.C §1030, et seq. and Title 18 U.S.C. §2710 et seq. Defendants are therefore in violation of the Unlawful prong of Unfair Competition Law.

284.     Defendants business acts and practices are also Unlawful in that they violate the California Constitution Article 1, Section 1, which articulates the inalienable right to pursue and obtain privacy. Defendants, their employees and agents willfully interfered with and obstructed the Plaintiff's right to Privacy.

285.     Defendants' Business Acts and Practices are Unfair because they have caused harm and injury-in-fact to the Plaintiff. And, for which Defendants have no justification Defendants' conduct lacks a reasonable and legitimate justification in that Defendant has benefited from such conduct and practices while the Plaintiff has been misled as to the nature of Defendants' products and services and has, in fact, suffered material disadvantages regarding his interest in the privacy and confidentiality of his personal information. Defendants' conduct offends Public Policy in California tethered to the

Consumer Legal Remedies Act, the state constitutional right to privacy and California's statutes recognition of the need for consumers to be informed and equipped to protect their own Privacy Interest.

286.    As a direct and proximate result of the aforementioned acts, the Plaintiff has suffered and continue to suffer injury, including but not limited to pain and suffering. The Plaintiff is entitled to injunction relief and restitution and other relief allowed under the Unfair Business Practice Law.

INJUCTIVE RELIEF

287. The Plaintiff realleges and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

288.    A real and immediate difference exists between the Plaintiffs and Defendants regarding the Plaintiffs' rights and Defendants' duty owed to the Plaintiffs to protect the Plaintiffs' real and personal property. Defendants' policies and actions have resulted and will result in irreparable injury to the Plaintiff. There is no plain, adequate or complete remedy at law to address the wrongs described herein. It has been made perfectly clear by their repeated escalation of the actions of the Defendants, their employees and agents that they intend to continue the practices described above, which makes it impossible for the Plaintiff to reclaim his life without an intervention of the Court. Unless restrained by this Court, Defendants will continue to implement these unlawful policies and practices.

289.    Defendants' acts alleged above violate established constitutional rights of Plaintiffs and Defendants could not reasonably have thought that the conduct of their agents and employees in seizing and destroying the Plaintiffs' property, burning The Property, drugging, hacking, threatening, stressing the Plaintiff was lawful.

290.    An actual controversy exists between the Plaintiff and Defendants in that Defendants, their agents and employees, have engaged in the unlawful and unconstitutional acts alleged herein and intend to continue to do so. The Plaintiff claim that these acts are contrary to law and seek a declaration of his rights with regard to this controversy.

291.    As a direct and proximate consequence of the acts of Defendants' agents and employees, the Plaintiff has suffered and will continue to suffer injury to his person and the loss of his real and personal property, including vehicles and bicycles, most of his clothing, furniture, personal papers and other personal possessions, stripping him of the essentials needed for his well-being and personal dignity and placing him at serious and immediate risk of illness in his current state of homelessness.

WHEREFORE, Plaintiffs pray as follows:

1. For a temporary restraining order, preliminary and permanent injunction, enjoining and restraining Defendants from engaging in the policies, practices and conduct complained of herein;

2. For a declaratory judgment that Defendants' policies, practices and conduct as alleged herein violate Plaintiffs' rights under the United States and California constitutions and the laws of California;

3. For the court to award restitution from Defendants.

4. For Summary Judgment against Farmers, US Bank, Citibank, Nationstar in the absence of factual dispute and no reasonable jury would rule in their favor.

5. For a court order for Farmers to provide Housing due to loss of use to the Plaintiff.

6. For compensatory damages to be determined by the court.

7. For Punitive Damages in an amount to be determined according to proof.

6. For such other relief as the Court deems just and proper.


Respectfully submitted,


DATED: June 26, 2019

By: _Javier Gurrola_ (signature)
Javier Gurrola